THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* HERMAN CARTER, Defendant-Appellant.

First District (1st Division)   Nos. 77-1234, 79-597 cons.

Opinion filed June 9, 1980.

James J. Doherty, Public Defender, of Chicago (Donald S. Honchell, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr, Joan S. Cherry, and Pamela J. Moran, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE O'CONNOR delivered the opinion of the court:

Defendant Herman Carter was charged with aggravated battery. At the conclusion of the first trial, defendant's motion for a new trial was granted. On the second trial, defendant was found guilty of four counts of aggravated battery and sentenced to a term of two to six years, from which he appeals. Defendant's *pro se* post-conviction petition was dismissed and he also appeals from that dismissal. In his appeal from his conviction he contends (1) defense counsel's frivolous attitude and failure effectively to represent defendant denied defendant able assistance of counsel, and (2) the sentence imposed upon defendant was improper because it was a penalty for refusing to admit guilt. In his appeal from the dismissal of his *pro se* petition, he contends that the trial court improperly dismissed the petition before defendant's court-appointed counsel had an opportunity to read the trial transcript or prepare an amended petition.

Edward Askew testified that on August 19, 1975, he was in the vicinity of 110th Street in Chicago, Illinois, playing a game known as "Kings Corner" with four other people. During this game, defendant approached to within two or three feet of Askew and his companions. Defendant asked the group if they wanted to shoot dice. Askew replied, "No." On cross-examination, Askew testified that it was Ernest Coleman who asked the group if they wanted to shoot craps and defendant was carrying a pistol at this point. Defendant was with Sherman Carter, who put his finger in Lucius Burns' nose, asking defendant if "[Burns] was the one." Frank Carter approached with a pistol in his pants and said, "these not the ones." The Carters then left and went down an alley, out of the view of Askew and his companions. Askew then went and sat on the porch of the house located at 17 West 110th Street with Lucius Burns, Vanessa Lewis, Fred Jones and Shirley Smith. None of the group sitting on the porch with Askew had a weapon.

Between 9:30 p.m. and 10 p.m., Askew again saw defendant. Defendant was then standing in the street, cursing and "hollering 'Black P. Stones' " and about being from the west side. Askew and his friends did not make any comment to defendant. Defendant was in the street for about five or 10 minutes. During that time, Sherman Carter threw a bottle. While defendant was in the street, Askew noticed between five and seven other people standing on the porch across the street from where Askew was sitting, and when defendant finished talking he and the other people

went into Frank Carter's house. Askew then saw five or six people come out of the house across the street and noticed defendant holding something with his hand and arm along the side of his body. Askew watched defendant come down the porch stairs to stand in front of the bushes, while the others remained on the porch. Defendant squatted in front of the bushes and Askew next saw a flash of light and heard a loud blast. Askew and the others with him on the porch started running. All were running in the same direction and then Askew heard another shot, a shot which was softer than the first shot, also fired from the other side of the street. After about a block, Askew and his companions stopped running. Askew noticed Jones, Burns and Smith were bleeding and he had been shot in the chest. Askew and his companions then met a police car and were taken to the hospital.

On cross-examination, Askew admitted to signing a document charging Steven Sneed, a defendant at the previous trial, with the offense of aggravated battery by firing a shotgun at him. Askew testified that he did not know the names of defendant or his co-defendants when he signed the complaint. Askew had had no courses in criminal law and knew nothing about the law of accountability of other people for the acts of the people that actually carry out the crime. Askew further testified that the street lights were on near the porch where he was sitting and he could distinguish the faces of persons in the bushes from where he sat on the porch.

On redirect examination, Askew testified that he had identified defendant as the assailant at the police station on August 19, 1975. He also stated that he had viewed defendant from a distance of from two to three feet earlier in the evening, prior to the shooting.

Lucius Burns testified and substantially corroborated Askew as to the shooting. Burns also testified that after the conversation in which defendant asked Frank Carter if Burns was the one, defendant and the people with him got into a car. Burns later saw defendant and the other people in the car when he was standing on the porch of the house located at 17 West 110th Street. The car stopped near a man named Glen Greenleaf, who was on foot. Coleman alighted from the car and fired two shots at Greenleaf. Coleman then got back into the car and the car was driven to the back of Frank Carter's house. The people from the car, including defendant, came to the front of the house. Defendant went to the middle of the street and addressed Burns and those that were with Burns. Defendant said, "I'm from the west side and you should be afraid," "Come on in the streets and fight head up, M. F.," "I'm gonna get y'all for messing with my brother," "Let's go head up and fight," "We got ours. Why don't you get yours?" The people on the porch at 17 West 110th Street did not say anything to defendant, but just sat and listened.

Burns admitted to signing a complaint against Steven Sneed alleging that Sneed fired the shotgun at him, but that he knew nothing about the law of criminal conspiracy or accountability. Burns also indicated that in July 1976, while talking with the Assistant State's Attorney preparing the case, he did not know who had the shotgun and that he was relying on the testimony of Edward Askew and Fred Jones for certain information.

Burns' and Askew's testimony as to the shooting was substantially corroborated by Shirley Smith and Fred Jones.

Chicago police officer David Dalponte testified that on August 19, 1975, he was with Officers Cornfield and Fitzmorris serving a search warrant at 10935 South State Street. At about 9:30 p.m., he heard a sound resembling a shotgun blast while they were at the rear of the building at 10935 South State Street. They ran between buildings to the front of the building. When they were east of State Street a half block north of 110th Street, they saw five young men run from an alley west of State Street and get into a car parked on 109th Place. Officer Dalponte and the other officers stopped the car as it pulled away from the curb. There were two people in the front seat of the car and three people in the rear seat. The occupants left the car, with defendant leaving from the rear on the right side of the car. Officer Cornfield found a shotgun in the rear on the right side of the car and a .32 caliber revolver on the front seat. Officer Dalponte testified that he inspected the shotgun by opening it and noticed it had been fired, because the gun was still warm and smelled of gunpowder. He also inspected the revolver by opening the cylinder and noticed that there were one live and four spent cartridges inside. He noticed the revolver felt warm also. Both weapons were taken to the police station and inventoried and then sent to police headquarters for storage.

Chicago Police Officer James Fitzmorris' testimony was substantially the same as that of Officer Dalponte.

Defendant's age was stipulated to as being 21 years; 19 years at the time of the occurrence.

Frank Carter, defendant's brother, testified that on August 19, 1975, he lived at 22 West 110th Street in Chicago, Illinois, with his wife and two children. At 6:30 p.m., defendant, Sherman Carter, Steven Sneed, Ronald Davis, Michael Nelson and Ernest Coleman arrived at Frank Carter's house. They played cards and listened to records in the basement of the house. They finished dinner at 8:45 p.m. and Frank Carter, defendant and Ernest Coleman then left the house to go to the liquor store. When the three of them returned to Frank Carter's house and got out of the car, a youth standing across the street yelled, "that hunky Frank," "Kill that hunky," "There's Frank." Frank Carter then heard a shot ring out, seeming to come from 17 West 110th Street, across the street at an angle

from where he lived, and he ducked. His guests, who were on his porch, ran and his wife threw him his .32-caliber gun. The people who ran went through a gangway to their car. Frank Carter shot into the air twice, but did not shoot at any people, and he did not fire a shotgun. Frank Carter testified that he did not hit anyone when he fired his gun and after doing so, he ran into his house. When his friends ran, they did not have a shotgun with them. Frank Carter did not see defendant fire a shotgun or crouch behind any bushes. Frank Carter said that earlier that evening at about 8 p.m. he heard a shotgun blast and, when he looked out of his window, he saw that a street light which had been on when his guests arrived at 6:30 p.m. was then out.

Frank Carter further testified that an individual named Clarence Blissett was across the street making threatening remarks to him during the time he heard the shot. Clarence Blissett said, "I'm gonna get you" to Frank Carter. Frank Carter knew Clarence Blissett to be a friend of Burns. Frank Carter had seen Glenn Greenleaf and Clarence Blissett at 2:30 p.m. on August 19, 1975, and both threatened him at that time. Frank Carter testified that he never approached Burns at the intersection nor did he see Sherman Carter at the intersection and neither of them had any conversations with Burns.

Sherman Carter's testimony was substantially the same as that of Frank Carter. Sherman Carter testified further that he was among the group that ran to the car parked at 109th Place. Upon arriving at the car, Sherman Carter got in first in the driver's seat. Coleman, Sneed, Davis and Nelson also got into the car. Defendant had been running behind the others in the group. Sherman Carter started the car before anyone got in and was holding the door open for defendant when plainclothes police officers came up from the rear and announced their office and told the people to stop. Officer Cornfield came out of the alley where the car had been parked with a shotgun in his hand, saying, "Look what I found." According to Sherman Carter, Officer Cornfield did not find the shotgun in the car. Sherman Carter knew there were no guns or shotguns in his car because he had checked it by asking if any of his riders had weapons before they entered and all had told him no. Defendant and the others were ordered out of the car and they were all taken into custody. Sherman Carter testified that no one he came with stopped in the street or talked to people across the street. He further testified that he did not hear defendant invite anyone to shoot dice, make any threatening remarks referring to gang membership in a gang, or see defendant crouch behind bushes and fire a weapon across the street. Sherman Carter further testified that neither he nor anyone with him had a gun on their person and that there were no weapons in his car when they all drove to Frank Carter's house.

Defendant Herman Carter testified that Sherman and Frank Carter were his brothers, Ernest Coleman was his cousin and Lillie Carter was his sister-in-law. On August 19, 1975, he received an invitation from his aunt to join his sister-in-law for dinner. He left his home in his brother Sherman's car with Sherman driving and with passengers Sneed and Nelson. On the way they stopped to pick up Coleman and Davis and arrived at 22 West 110th Street at about 6:30 or 6:35 p.m. They parked on 109th Place after finding no parking spaces on 110th Street. The group reached Frank Carter's house by walking through the alley. From the time of his arrival at his brother's house to the time he fled to Sherman Carter's car after the alleged shooting incident when he returned from the liquor store, defendant's testimony was identical to that of Frank and Sherman Carter. Defendant denied that the shotgun recovered by the police belonged to him and stated that he had not seen the shotgun in or out of the car. Defendant also testified that he was handcuffed at the police station and beaten by the officer. Defendant denied the charges in the indictment. On cross-examination, defendant testified that he went to a doctor upon his release from jail as a result of his beating. He did not have a weapon when he left Frank Carter's house to go to the liquor store, he did not know Jones, Askew, Smith, Lewis or Burns and he never addressed them from the middle of the street.

During redirect examination, defendant testified that Nelson, Sneed, Davis and Coleman were not available to testify at the second trial because he could not locate them in time to serve the subpoenas. On re-cross-examination it was brought out that defendant's attorney had never requested a continuance to contact the above parties and had demanded trial on several occasions.

On rebuttal, Officer John Fitzmorris testified that on August 19, 1975, he arrested defendant, but that neither he nor any other officers beat defendant when he was in custody.

In his appeal from his conviction, defendant first contends that defense counsel's conduct during trial was so frivolous as to deny defendant effective assistance of counsel. The State maintains that defendant's privately retained counsel competently represented him.

■■ In *People v. Murphy* (1978), 72 Ill. 2d 421, 436, 381 N.E.2d 677, the court set out the test to be applied to privately retained counsel:

"A strict test is applied in determining whether privately retained counsel is incompetent:

'In such a case the court will not reverse a conviction because of the incompetency of counsel unless the representation is of such a low caliber as to amount to no representation at all or reduces the court proceedings to a farce or sham.' *People v. Torres* (1973), 54 Ill. 2d 384, 391.

See also, *e.g., People v. Redmond* (1972), 50 Ill. 2d 313, 315; *People v. Washington* (1968), 41 Ill. 2d 16, 22."

Mistakes in strategy will not render the representation incompetent. (*People v. Torres* (1973), 54 Ill. 2d 384, 297 N.E.2d 142; *People v. Robinson* (1979), 70 Ill. App. 3d 24, 387 N.E.2d 1114.) "In addition, the fact that another attorney in the better light of hindsight may have handled the trial in a different manner is not an indication of the trial counsel's incompetence." (*People v. Robinson* (1979), 70 Ill. App. 3d 24, 27.) It is presumed that counsel was competent and this presumption can be overcome only by strong and convincing proof of incompetency. (*People v. Bach* (1979), 74 Ill. App. 3d 893, 393 N.E.2d 563.) Furthermore, the competency of counsel depends upon the particular facts and circumstances of each case which are viewed in their totality from a review of the entire record rather than from a narrow focus upon isolated instances occurring during the course of the trial. *People v. Clark* (1977), 47 Ill. App. 3d 624, 365 N.E.2d 20.

Defendant cites 23 specific instances which he argues indicate defense counsel's frivolous attitude and 31 specific instances which he argues indicate defense counsel's failure to act at all or to act properly in defendant's best interest, thereby demonstrating defense counsel's ineffectiveness. Defendant argues that defense counsel (1) did not act to weaken certain witnesses' testimony; (2) needlessly established details not previously provided by State witnesses in their testimony; (3) did not offer necessary and appropriate objections to limit the evidence presented by the State to that admissible under the rules of evidence; (4) improperly handled certain prospective defense witnesses; (5) in his closing argument failed to establish certain points while referring to facts not elicited at trial; and (6) failed to secure individual polling of the jurors. We do not find it necessary to discuss separately each of the 54 instances defendant argues demonstrate defense counsel's ineffectiveness.

With regard to the instances which defendant designates as counsel's frivolous attitude, it appears that some of the remarks made by defense counsel were made outside the presence of the jury and would therefore have had no effect upon the jurors. In addition, upon a review of the entire record, which necessarily includes the instances where defense counsel's remarks were made in the presence of the jury, it cannot be said that defense counsel's conduct reduced the trial to a farce or a sham.

With regard to the six different categories of conduct which defendant argues indicate defense counsel's failure to act at all or properly in defendant's best interest, "a review of counsel's competency does not extend to areas involving the exercise of judgment, discretion or trial strategy." *People v. Monreal* (1976), 42 Ill. App. 3d 842, 846, 356 N.E.2d 921.

■■ ■ The two instances cited as indicating that defense counsel did not act to weaken certain witnesses' testimony cannot be focused upon as isolated instances occurring during the course of the trial, but rather must be viewed with reference to a review of the entire record. (*People v. Clark* (1977), 47 Ill. App. 3d 624, 365 N.E.2d 20.) The decision which defense counsel made not to attempt to impeach (a) Shirley Smith in regard to a statement made during the second trial but omitted from her testimony at the first trial, and (b) Edward Askew in regard to a statement made during the first trial but omitted from his testimony at the second trial was merely one of trial strategy and is therefore not evidence of incompetence of counsel.

■■ Defendant argues that defense counsel needlessly established details not previously provided by State witnesses in their testimony. However, after a review of the record we find that the specific instances defendant cites do not support his argument. Defense counsel elicited details from certain State witnesses in an attempt to cast doubt upon their versions of the occurrence. For example, defense counsel thoroughly cross-examined each witness with regard to his ability to identify defendant during the occurrence. He attempted to elicit testimony that would indicate there were poor lighting conditions which would make the witnesses' identification of defendant questionable. Although the defense attorney was unsuccessful in this attempt and in creating doubt with regard to the credibility of these witnesses about other subjects, his conduct was an effort to discredit the State's witnesses and any error in judgment or trial tactics is not to be considered evidence of incompetency of counsel. *People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677.

Defendant also contends that defense counsel's ineffectiveness was demonstrated when defense counsel did not offer necessary and appropriate objections to limit the evidence presented by the State to that admissible under the rules of evidence. Even assuming that the evidence was improperly admitted, we reject defendant's argument. "While failure to object may have been poor judgment, it did not amount to no representation or turn the proceedings into a farce. In any event, incompetency is not established by mere failure to object to inadmissible evidence." *People v. Murphy* (1978), 72 Ill. 2d 421, 438, 381 N.E.2d 677.

■■ We likewise reject defendant's contention that defense counsel's alleged improper handling of certain prospective defense witnesses thereby denied defendant effective assistance of counsel. Defendant argues that defense counsel showed he had been unable to locate certain defense witnesses but had not requested any continuance in order to locate them and had in fact been demanding trial; in addition, defense counsel had made no effort to use transcripts of the testimony of Michael Nelson and Steven Sneed from the first trial. Defendant also argues that

indicative of defense counsel's incompetence was his failure to call Lillie Carter, Frank Carter's wife, as a witness. We find that these decisions made by defense counsel are within the area of trial strategy and therefore are not to be considered evidence of incompetency of counsel.

Defendant contends that in his closing argument defense counsel failed to establish certain points, while referring to facts not elicited at trial. We do not agree. During closing argument, defense counsel vigorously argued in defendant's behalf. He brought out the lack of fingerprints on the weapon involved and the fact that the lighting conditions during the occurrence were allegedly poor. He also countered the State's closing argument which emphasized the testimony of one of its occurrence witnesses and also attempted to impeach another witness for the State. The defense attorney also attempted to point out the incredibility of Burns' testimony. This is not a situation where in closing argument defense counsel admitted his client's guilt (*People v. Robinson* (1979), 70 Ill. App. 3d 24, 387 N.E.2d 1114; *People v. Carter* (1976), 41 Ill. App. 3d 425, 354 N.E.2d 482), or was confusing and incoherent (*People v. Redmond* (1972), 50 Ill. 2d 313, 278 N.E.2d 766).

■■ Finally, defendant contends that defense counsel failed to secure individual polling of the jurors thereby denying defendant effective assistance of counsel. We do not agree. The right to poll a jury may be waived. (*People v. Pickett* (1973), 54 Ill. 2d 280, 296 N.E.2d 856.) "Customarily, before a sealed verdict is returned, there is an agreement of counsel that the jury may return a sealed verdict and separate, and the defendant's counsel waives polling the jury." (*People v. Pickett*, at 284.) Although there is nothing in the record before us indicating that an agreement existed between the State and defense counsel not to poll the jury, we do not find defense counsel's failure to request the jury be polled is evidence of ineffective assistance of counsel. We view such failure as an exercise of defense counsel's judgment, discretion or trial strategy.

After reviewing the entire record, we find that defense counsel's conduct did not reduce defendant's trial to a farce or a sham. Defendant was not denied effective assistance of counsel.

Defendant's second contention is that his sentence of two to six years was imposed as a penalty for refusing to admit guilt and that he is entitled to a new sentencing hearing.

■■ Defendant was given an opportunity to address the court before his sentencing. He asked to be allowed to visit with his wife and children and stated that if he received probation he would finish college and work part-time. The trial judge imposed sentence, stating:

"Well, Herman Carter, you were found guilty and rightfully so, by the jury. Certainly this kind of action on your part indicated taking the law into your own hands and trying to settle it on the

streets and by taking a shotgun as you did firing it as it was proven before the jury.

This Court finds that certainly that you shouldn't be entitled to even a minimum sentence of incarceration because this kind of action indicated a temper on your part, the temper that really can't be trusted around society for a while.

You have to learn to control your own emotional temper that you can't just, you know, on your own accord decide that because you dislike some person that you are going to put an end to their conduct by firing guns at them and seeing whether or not you can either create great bodily harm or kill them. And maybe you are lucky that you are not here for murder.

But this Court, based on the evidence also finds that really you don't even acknowledge the fact that you are guilty of this offense and you really wouldn't be entitled to a minimum because you haven't even realized that you did or committed a wrong and before a person is entitled to some kind of a minimum or even probation, as your lawyer suggests, you have to realize that you made a mistake, you created a wrong and something you should never be doing, you never want to do in the future, and I don't think you have even reached that stage yet.

So, based upon the evidence and the jury's findings of guilty and judgment has been entered on the finding, if it hasn't now, the Court does sentence you, Herman Carter, to the Illinois Department of Corrections for not less than two years and not more than six years."

The trial judge is normally in a better position to determine the punishment to be imposed than a court of review and, absent an abuse of discretion by the trial court, a sentence may not be altered upon review. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) The proper factors upon which to base a sentence include the failure of defendant to show a penitent spirit. (*People v. Morgan* (1974), 59 Ill. 2d 276, 319 N.E.2d 764; *People v. Slavin* (1978), 66 Ill. App. 3d 525, 383 N.E.2d 1303; *People v. Bigsby* (1977), 52 Ill. App. 3d 277, 367 N.E.2d 358; *People v. Petty* (1975), 33 Ill. App. 3d 183, 337 N.E.2d 249.) Other factors are the seriousness of the crime, prior convictions and " 'the general moral character of the offender, his mentality, his habits, his social environments, his abnormal or subnormal tendencies, his age, his natural inclination or aversion to commit crime, [and] the stimuli which motivate his conduct * * *.' " *People v. Dukett* (1974), 56 Ill. 2d 432, 452, 308 N.E.2d 590, *cert. denied* (1974), 419 U.S. 965, 42 L. Ed. 2d 180, 95 S. Ct. 226.

Defendant relies on *People v. Sherman* (1977), 52 Ill. App. 3d 857,

368 N.E.2d 205, to support his contention that defendant's lack of penitent spirit should not have been considered by a trial judge when imposing sentence. The court there stated (52 Ill. App. 3d 857, 859):

> "* * * [T]he law is abundantly clear that a defendant's punishment may not be increased because of his refusal to admit his guilt following a conviction. (See *Poteet v. Fauver* (3d Cir. 1975), 517 F.2d 393.) * * * The rewarding of a defendant's admission of guilt following trial can only serve to jeopardize that individual's right of appeal or prospects of post-conviction relief. See *Poteet v. Fauver* (3d Cir. 1975), 517 F. 2d 393, and *Herbert v. Maryland* (1976), 31 Md. App. 48, 354 A.2d 449."

However, the court in *People v. Sherman* did not reconcile its decision with the Illinois cases holding that a proper factor upon which to base a sentence is the failure of a defendant to show a penitent spirit. *People v. Morgan; People v. Slavin; People v. Bigsby; People v. Petty.*

The trial judge here heard evidence in mitigation that defendant was 21 years old, was married and had children. Prior to the incident giving rise to his conviction, he had been attending a skill center and had been employed. The evidence in aggravation showed that the crime committed was one of a serious and unprovoked nature and that defendant did not have a penitent spirit. We cannot find that the trial judge relied upon improper considerations in sentencing the defendant.

■■ Defendant's final contention is that the trial court erred in dismissing his *pro se* petition for post-conviction relief before defendant's court-appointed counsel had an opportunity to obtain the transcript of defendant's trial and prepare an amended petition. The State maintains that defendant's *pro se* petition for post-conviction relief was properly dismissed because it failed to allege any specific violations of defendant's constitutional rights. Defendant's *pro se* petition merely alleged that defendant's conviction resulted from a "substantial denial of his Constitutional Rights" and the trial judge stated that the petition did not make any "substantial showing of a constitutional violation." The public defender representing defendant asked the trial court for a continuance so that he could have an opportunity to read the trial transcript which had not yet been prepared as of that date. When asked by the court to specify the alleged constitutional violation, defendant's counsel stated:

> "The allegation is that Mr. Carter's privately retained counsel, I hate to use the word inaffective [*sic*], but he was inaffective [*sic*] in the fact that after the second trial was completed, he took money to raise a direct appeal from Mr. Carter."

"An evidentiary hearing under the Post-Conviction Hearing Act should be granted only if the petition makes a substantial showing of a constitutional violation, and conclusional allegations are not sufficient to require an

evidentiary hearing." (*People v. Jones* (1977), 66 Ill. 2d 152, 157, 361 N.E.2d 1104.) A post-conviction petition is also properly dismissed if the record shows that the petition has no merit. (*People v. Jones.*) In addition, it is well established that in a post-conviction proceeding the burden is on the petitioner to set forth clearly in what respects his constitutional rights were violated. (*People v. Farnsley* (1973), 53 Ill. 2d 537, 293 N.E.2d 600; *People v. Sanford* (1978), 57 Ill. App. 3d 599, 373 N.E.2d 654.) A petitioner must also support his allegations with affidavits, records or other evidence which establish a violation of constitutional rights or state why the same are not attached. Ill. Rev. Stat. 1977, ch. 38, par. 122—2; *People v. LeCompte* (1976), 38 Ill. App. 3d 513, 347 N.E.2d 797.

■■ Here, defendant's *pro se* petition for post-conviction relief recited only conclusional allegations. In addition, no supporting evidence accompanied defendant's petition. Defendant did not meet his burden of setting forth clearly the constitutional rights which he alleges were violated.

■■ We also note that, considering the public defender's comments at the proceeding dismissing the petition, the only constitutional right which could conceivably have been alleged to have been violated was defendant's right to effective assistance of counsel. Defendant raised the identical issue in his direct appeal, and we have found that the record did not support defendant's contention that his trial counsel was incompetent. Where an allegation has been considered and rejected on direct appeal, any reconsideration of the same allegation is barred by the doctrine of *res judicata*. (*People v. Partin* (1977), 69 Ill. 2d 80, 370 N.E.2d 545.) We find that the trial court properly dismissed defendant's *pro se* petition for post-conviction relief.

Defendant's conviction and sentence and the dismissal of his *pro se* petition for post-conviction relief are affirmed.

Affirmed.

GOLDBERG, P. J., and McGLOON, J., concur.