THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* MAURICE CHILDS, Defendant-Appellant.

First District (5th Division)    No. 79-762

Opinion filed April 16, 1981.

Ralph Ruebner and Alan D. Goldberg, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr and Thomas J. Leanse, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE MEJDA delivered the opinion of the court:

Defendant was charged by information with the offense of attempt murder, aggravated battery and unlawful restraint. (Ill. Rev. Stat. 1977, ch. 38, pars. 8—4, 9—1, 12—4, 10—3.) Defendant was tried in a bench trial and found guilty of attempt murder. He was sentenced to a term of 50 to 75 years. On appeal, he contends that: (1) the court erred in denying him access to the State's transcripts of the prior mistrial; (2) he was denied effective assistance of counsel in that his attorney failed to obtain a full transcript of the previous mistrial; (3) he was not proved guilty beyond a reasonable doubt; (4) the court erred in advising him that he could receive an extended term under the new sentencing act; and (5) his sentence is excessive. We affirm.

After 10 days of testimony and 2½ days of deliberation at defendant's first trial, a mistrial was declared based upon the jury's deadlock. The case was transferred to another judge, and after two days of *voir dire* for his second trial, defendant waived a jury. The following pertinent evidence was adduced at the second trial.

On November 6, 1976, Mary Leen was working as a night maid at the Sheraton Towers Hotel, located in Oak Lawn. She had worked at the hotel for about a year and was also a student at Moraine College. Her

primary responsibility at the hotel was to clean the rooms on the first and second floors which were used by employees of the Grand Trunk railroad.

Mary arrived at the hotel a few minutes after 4 p.m. After cleaning two rooms, she called home and was informed that Julie Brady had called for her between 4:30 and 4:45 p.m. Mary then went down to the second floor, bought a can of soda, and proceeded to room 205 which was vacant. Many evenings while waiting to clean other rooms, Mary would sit in room 105 or 205 and drink soda and watch TV. She preferred these two rooms because she was able to see the digital clock across the street. Before entering room 205, she placed her cleaning cart in the alcove against the wall outside the room. Room 205, like all '05 rooms, has a main room, a vanity area, and a bathroom. The bedroom area has two large beds with a nightstand between. There is a phone and a lamp on the nightstand. A dresser with a television set sits against the wall opposite the beds. The vanity area, which includes the bathroom, is a few feet from the door on the left when one enters.

Mary arrived at room 205 about 5:15 p.m. Upon entering, she left the door open because it was the hotel's policy not to close the door while cleaning a room. Thereafter, she sat on one of the beds, turned on the lamp on the nightstand, and dialed Julie Brady's phone number. She talked to Julie for 10 to 15 minutes. The conversation ended when Mary, who was still sitting on one of the beds, noticed a shadow on the wall near the entrance to room 205. Mary then said, "Ssh, hold on a minute. There is someone here." She then put the receiver down on the bed, walked to the doorway, looked into the hallway, saw nothing but the cart, and then turned and looked into the vanity and then in the bathroom. As she turned around, she saw a blue and white gym shoe sticking out of the bathroom. She looked up and a man stuck his head out from behind the doorway. Mary had never seen this man before so she asked him what he was doing in the room. He indicated he lived right upstairs and had just come in to get towels. Because it was unusual for someone to come into another room for towels, Mary replied that she would have to call the front desk to check. When Mary started to dial the front desk, the man said, "Put down the phone or I'll slit your throat."

Mary did not indicate the exact height of her attacker but did state that he was about the same height as her brother Tommy, who was 6'3''. Her attacker was not wearing anything on his head but was wearing a navy blue windbreaker, a blue cotton shirt and blue jean-type pants. She identified defendant as her attacker.

Defendant was standing at the end of the bed, pulling a knife from his pants, when he told Mary to put the receiver on the phone and to put the phone on the nightstand. He told her to sit down and shut up, and she

sat on the bed closest to the window. Defendant sat opposite her on the other bed which was about 2 or 3 feet away.

Mary repeatedly asked defendant what he wanted and requested that he leave. He then indicated that he wanted to make love to her. To avoid getting raped, Mary told him she was married and three months pregnant, and that her husband was coming to pick her up at 10 p.m. None of these things was true.

During this time the door to the room was closed. Mary continued to tell defendant that someone would come and check on her and that if he did not want to get caught, he should just go. This too was untrue. Defendant then stood up, grabbed her hair, placed the knife across her throat, and said, "Lie down, it won't hurt." Mary pleaded with him to please sit down, not to hurt her and told him that if he would leave she would not tell anyone. Mary told defendant that if she did not call or go down to the front desk, someone would come up and check on her at 6 p.m. She also told defendant that she had other rooms to clean at 6 p.m. Defendant looked at his watch and informed her that it was only 5:55. She told him to check the bank clock. When he started to walk to the window, Mary ran toward the door. She got to the end of the bed closest to the door when defendant grabbed her and turned her around. She saw a knife coming toward her face, she used her hand to block it, and the knife came through her hand. She was also stabbed in the left torso area from her shoulder down to her waist, on her arms and on her right buttock. She estimated that she was stabbed 14 or 15 times. Mary again attempted to run towards the door but instead fell into the bathroom. Defendant demanded that she open the door so she crawled on her knees over to the door, turned the handle, and opened the door. Defendant walked past her, turned and stabbed her again below the left breast. He then ran toward the stairwell door directly across the hall. Mary went to the phone, dialed the front desk, told them she was in room 205, and that she had been stabbed. She attempted to walk towards the door but got only as far as the dresser where she sat until help arrived.

Mary was taken to the hospital and placed in intensive care. She could not remember the day she woke up but did recall two police officers in the intensive care unit showing her four or five photographs, none of which was of her assailant. The emergency room physician testified that it is possible that Mary suffered from amnesia during the period she was unconscious but that amnesia would not affect her memory regarding events that occurred prior to her unconscious state.

At about 6 p.m. on November 6, 1976, Officer Banas was on patrol about 10 blocks from the hotel when he heard the report of the stabbing. Banas arrived at the hotel the same time as the ambulance vehicle, about 3 to 5 minutes after hearing the message on the radio. He stayed in the

lobby when the ambulance crew went up. Banas and the other officers waited for the other elevator. When the elevator arrived, the door opened and a Negro man with a dog stepped out. This man was over six feet tall, slender build, and about 25 to 30 years of age. He was wearing a light-colored mod-type cap with a snap brim, a brown vinyl or leather jacket, and blue jean trousers. Banas later learned that this man was the defendant. There were no bloodstains on his clothing and nothing suspicious about his behavior or appearance.

Banas proceeded to room 205 where he observed the ambulance crew enter and heard Mary say that a "black guy" had assaulted her. Banas used the police radio to advise other officers of the description of the man he saw leaving the elevator. As he put out the message, two hotel employees told him that that individual was a guest at the hotel.

On cross-examination Banas stated that when he saw defendant getting off the elevator on November 6 he looked like he needed a shave, and that he had several days' growth of beard. He also appeared to have a moderate-type Afro haircut similar to his hair at the time of trial. He stated that he was sure defendant was wearing a brown jacket and that he definitely was not wearing a blue windbreaker or a blue denim jacket.

Officer Gilbert, who also worked for the hotel during his off-duty hours, heard the radio message and proceeded to the hotel. He and Officer Kowalczyk made a search of the building. After the search, Gilbert spoke with three men who saw a male Negro approximately 6 feet tall, weighing 160 to 170 pounds, dark complexion, wearing glasses and a dark coat, leave the hotel and drive off in a silver Mercedes. Even though the three men had been drinking, Officer Gilbert put the description on the radio. The hotel manager and two desk clerks informed Gilbert that defendant fit the description and was staying with Mrs. Childs in room 305. Around 7 p.m. Officers Gilbert and Kowalczyk went to room 305 and checked the area for blood, but saw none. They knocked on the door but received no answer. On cross-examination Gilbert testified that he did observe blood smears on one of the stairway doors in the hotel, on either the first floor or lobby.

On the evening of November 8, 1976, Detective Andersen, Lieutenant Taylor and Detective Schryver went to room 305. Mrs. Childs answered the door. Defendant was also present. The officers advised defendant and Mrs. Childs that the police were investigating a stabbing at the hotel and asked if they would come down to the station. Mr. and Mrs. Childs agreed and put on their coats. Defendant wore blue jeans and a blue jean-type shirt. At the station defendant agreed to be fingerprinted and photographed. Thereafter, defendant and Mrs. Childs returned to the hotel.

Following the cross-examination of Officer Andersen, defense coun-

sel requested that the State be required to produce any transcript that it had of Officer Andersen's testimony at the previous trial. Defense counsel indicated that he had secured as many transcripts as he could afford but not this one. The court refused to order the State to produce the transcript but did place it on a voluntary basis. Thereafter, the State refused to produce the transcripts in their possession and advised defense counsel to obtain his own copy from the court reporter's service.

On November 9, Mary was removed from the intensive care unit. On that day Officer Schryver made arrangements to show Mary more photographs and to interview her. Schryver handed Mary 10 black-and-white photographs, 9 of which had been pulled from police files and the 10th was the picture taken of defendant the previous evening. She made a positive identification of defendant's photograph. She also told the officers that her assailant was as tall as her brother. Defendant was arrested that same evening. He wore blue jeans, a blue denim shirt, a navy blue windbreaker and a wristwatch to the station.

A police lab technician testified. He tested the clothes defendant wore at the police station and those worn by Mary at the time of her attack. Type "O" human blood was present on Mary's jacket and was possibly present on Mary's pants and white sweater as well as defendant's blue windbreaker. The white towel taken from room 205 indicated the possible presence of type "B" human blood. Defendant's blue jeans showed the presence of type "B" human blood. Mary's blood type is "O" and defendant's is "B".

Defendant testified that he was 23 years old, 6'4" tall, weighed 165 to 170 pounds, and that he has had a mustache and goatee since 1974. His hair has been the same style since 1974. Defendant further testified that he spent Saturday afternoon, November 6, in his hotel room with his wife. Around 3 p.m. he drove his wife to work. At this time he was wearing work shoes, blue jeans, a brown T-shirt, a blue windbreaker, blue denim jacket, and a blue denim hat. He was not wearing his blue denim shirt because his dog has urinated on it. However, at the first trial, he testified that he was pretty sure he was wearing a blue denim shirt. After dropping his wife off at work, defendant returned to the hotel.

Between 5 and 5:30 p.m. defendant tried to reach room service but was unsuccessful. After several attempts to get room service by dialing "zero," he called down to the front desk and was given a four-digit number for room service. He tried that number but again did not reach room service.

At about 6 p.m. he left the hotel with his dog to go to the laundromat to wash his work clothes. Defendant, carrying his clothes in a plastic bag, took the elevator to the lobby. As he stepped out, defendant saw an ambulance crew wheel a stretcher into the elevator. Defendant pro-

ceeded to the laundromat where he washed his clothes, including the windbreaker. While his clothes were washing and drying, defendant sat in his car listening to the radio. At the end of the drying cycle, his jeans were not dry but he did not have any more money, so he returned to the hotel around 6:45 p.m. for more change. As he entered the hotel, the desk clerk informed him that his wife had called. After calling his wife, he returned to the laundromat to finish drying his clothes. Thereafter, he returned to the hotel where he stayed in his room until 9:40 p.m. when he left to pick up his wife from work. He and his wife returned to the hotel and remained in their room until the next day when they went shopping. Defendant further testified that he had seen Mary the week prior to the stabbing when his dog jumped upon her in the lobby. Defendant owned two pairs of blue-and-white tennis shoes and several knives—a little steak knife, a hook bill knife and a fold-up knife. He testified that he kept his room key on a ring along with his car keys. He also indicated that he never asked the maids for towels and that he never went to the fourth floor to ask for towels.

Mary McTernan, also a maid at the hotel, testified that on the Monday prior to the stabbing she saw defendant on the fourth floor, that he asked for some towels, and that she gave him a towel. Mary Richardson, another maid, also testified that she saw defendant on the fourth floor on one occasion. The victim, Mary Leen, testified, in rebuttal, that no dog had ever jumped upon her at the hotel.

Thereafter, defendant was found guilty of attempt murder. After a hearing in aggravation and mitigation, defendant was sentenced under the code in effect on November 6, 1976, to a term of 50 to 70 years. Defendant appeals.

OPINION

I.

Defendant first contends that the court erred in denying him access to the transcripts of the prior mistrial which were in the possession of the State. He argues that the court's refusal to order the State to turn over the transcripts was a violation of Supreme Court Rule 412(a). (Ill. Rev. Stat. 1977, ch. 110A, par. 412(a).) The rule requires the State, upon written motion of defense counsel, to disclose all prior statements of the State's witnesses and of the defendant. He also submits that because his financial situation prevented him from obtaining all the transcripts from the court reporter, the refusal denied him equal protection of the law. The State maintains that the court's refusal to order it to turn over the transcripts did not violate the rule or the equal protection clause of the fourteenth amendment of the United States Constitution in that defendant had equal

access to the transcript and was not indigent and the request was not timely.

■■ It is well settled that where there has been a mistrial a defendant is entitled to a copy of the transcript, free of charge if he cannot afford one, to aid in the preparation of his second trial. *People v. Delafosse* (1967), 36 Ill. 2d 327, 223 N.E.2d 125; *People v. Russell* (1972), 7 Ill. App. 3d 850, 289 N.E.2d 106.

Prior to the first trial, defendant filed two discovery motions and the State filed three answers. No new discovery motions were filed between the first and second trials. Nor did defendant request a free transcript of the prior trial. The second trial began on March 29, 1978. Following the cross-examination of Officer Andersen, defense counsel requested that the State be required to produce any transcripts it possessed of the prior testimony of Officers Andersen and Taylor. Defense counsel stated that he had obtained as much of the transcripts as he could afford but not the requested portions. The court then ruled as follows:

"THE COURT: We have got from today, which is Thursday, until Monday to recess. If the State is in possession, it wants to grant you the use of its transcript, they can go ahead and do that. But I find it a little—that the State hasn't used it to refresh his recollection. It was as equally available to you as it was to the State.

The trial was held a number of months ago. I just don't think that that is a reasonable request on your part, especially at this particular state of the proceeding. I know that lawyers sometime mark up Exhibits. If they used it to refresh a witness's recollection, I wouldn't have any problem with ordering them to produce it for you, but they haven't used it. And I don't really think, as a matter of law, you are entitled to it. You had as equal access to it.

If they are willing to produce it to you, we have plenty of time between now and Monday to do that.

[Defense counsel]: You are putting it on a voluntary basis, your Honor. You are not going to order the State to let me examine their copy of the transcript?

THE COURT: No. I am not going to order them to let you examine their transcript, not of this witness anyway."[1]

■■ The goal of pretrial discovery is to promote the fact-finding process and to eliminate the factual advantage of surprise by either side. (*People v. Szabo* (1977), 55 Ill. App. 3d 866, 371 N.E.2d 117.) It is to provide a

---

[1] Defense counsel subsequently represented that he also lacked the transcripts of the complaining witness' testimony taken at the previous trial. However, he did not at that time request that the State be ordered to turn over their copy of this transcript, but rather attempted to impeach the complaining witness through the use of his prior trial notes.

defendant with protection against surprise, unfairness and inadequate preparation, as well as to afford the defense the opportunity to investigate the circumstances surrounding the statement. (*People v. Miles* (1980), 82 Ill. App. 3d 922, 403 N.E.2d 587; *People v. Boucher* (1978), 62 Ill. App. 3d 436, 379 N.E.2d 339.) Defendant does not argue that the State failed to properly answer his discovery request or that he was surprised. Defendant's counsel was the same for both trials and had the same information and opportunity as the State to obtain transcripts, even without cost upon a proper application. Consequently, defendant can hardly claim that the State's possession of a copy of the previous trial's transcript created a factual advantage of surprise.

■■ Rather, defense counsel's efforts to obtain the transcript of Andersen's prior testimony was for impeachment, not discovery purposes. As a general rule the prosecution on demand is required to furnish an accused for possible impeachment use specific statements in its possession or control which were made by the State's witness, which have been shown to exist and which are in the witness' own words or substantially verbatim. *People v. Allen* (1970), 47 Ill. 2d 57, 264 N.E.2d 184; *People v. Rose* (1978), 65 Ill. App. 3d 264, 381 N.E.2d 1215.

Accordingly, a determination of the present issue is guided by the principle set forth in *People v. Telio* (1971), 1 Ill. App. 3d 526, 275 N.E.2d 222. There, the defendant was charged with possession of heroin. Prior to trial he made a motion to suppress the evidence and a hearing was held at which the court denied the motion. Six days later defendant went to trial. After the prosecution concluded direct examination of its first witness who also testified at the hearing to suppress the evidence, defendant's counsel indicated to the court that he detected an inconsistency in the officer's testimony, that the State had a transcript of the hearing, and that he needed the transcript to cross-examine the officer. The State objected, saying that defendant was not entitled to the transcript because he could have purchased a copy. Defendant's counsel then responded that he could not afford the price of the transcript. Thereafter, defendant's request was denied. Although defendant's conviction was upheld on appeal, the court stated:

> "The trial of a criminal case is not a poker game with each side holding its best cards close to the vest. It is, as are all trials, a search for the truth. One of the primary objects of this search is determination of the credibility to be given the testimony of a witness. Bearing this objective in mind, it is unseemly for the transcript of a witness' testimony to be in the courtroom, capable of production without inconvenience or delay, and a good-faith request for its use for cross-examination refused on technical differences, many though they be, between the transcript of a hearing before a grand

jury and the transcript of a hearing before a trial judge, or on the more abstract nuances of poverty or affluence. Moreover, the conclusion we deduce from the cited cases is that defendant was entitled to the transcript; it contained the statements of a witness. Therefore, the trial judge erred in refusing defendant's request so that his lawyer could use the transcript in cross-examining [the officer]." 1 Ill. App. 3d 526, 530, 275 N.E.2d 222, 226.

The State also argues that the denial of defendant's request for the transcript during the middle of the State's case was proper in that the request was untimely and could potentially delay the trial. (See *People v. Wolff* (1979), 75 Ill. App. 3d 966, 394 N.E.2d 755.) The record, however, does not sustain this contention. Defendant's counsel requested to see the transcript during a four-day recess. He also indicated that if it was convenient, he would photostat the transcript and return it to the State's Attorney's Office. Accordingly, no delay would have occurred had the State provided defendant with access to the transcript during this recess. The State does not otherwise attempt to justify its refusal to turn over the transcript of Andersen's testimony. Accordingly, we agree with the rationale stated in *Telio* and conclude that the State should have been required to turn over the transcript to defense counsel for use in cross-examining Andersen.

■■■ Nevertheless, a defendant who requests but is denied a free transcript has an obligation of showing that he was prejudiced by that denial. (*People v. Knowles* (1979), 76 Ill. App. 3d 1004, 395 N.E.2d 706; *People v. Carroll* (1973), 12 Ill. App. 3d 869, 299 N.E.2d 134; see also *People v. Telio* (1971), 1 Ill. App. 3d 526, 275 N.E.2d 222.) When defendant's counsel requested that the State be ordered to turn over its transcript of Andersen's prior testimony, he did not indicate any particularized need for the transcript. (See *People v. Gill* (1972), 7 Ill. App. 3d 24, 31, 286 N.E.2d 516, 520.) Nor did defense counsel indicate that Andersen's testimony at the second trial was in any way inconsistent with his testimony at the previous trial. (Compare *People v. Telio*; *People v. Wolff*.) It should be noted that defendant's counsel was the same at both trials and that the court permitted defense counsel to cross-examine and attempt to impeach Andersen as well as the complaining witness on the basis of the trial notes he had taken at the previous trial.

Although defendant's counsel extensively cross-examined each of the State's witnesses, no offer of proof was made suggesting that the transcript of the previous trial would show any material discrepancy or inconsistency in the testimony of the State's witnesses between the first and second trials. Similarly, on appeal defendant does not allege or show any inconsistencies which the transcripts may have disclosed. Accordingly, we conclude that defendant has failed to establish that he was prejudiced

by the court's refusal to order the State to turn over the transcripts in its possession.

## II.

Defendant next contends that he was denied effective assistance of counsel in that the failure to obtain a complete transcript of the previous mistrial demonstrates that the preparation for the instant trial was inadequate. He argues that it is difficult to conceive of a document more critical to trial preparation. The State maintains that defendant received effective and competent assistance where the retained counsel's cross-examination of the State's witnesses reflected adequate preparation and clearly did not reduce the proceedings to a farce or sham.

Defense counsel in the instant case was privately retained. The standard by which such counsel is measured is whether the representation was of such low caliber as to amount to no representation at all or to reduce the court proceedings to a farce or a sham. (*People v. Murphy* (1978), 72 Ill. 2d 421, 381 N.E.2d 677; *People v. Julian* (1980), 89 Ill. App. 3d 60, 411 N.E.2d 337; *People v. Cheung* (1980), 83 Ill. App. 3d 1048, 404 N.E.2d 558.) A defendant is entitled to competent, not perfect or successful, representation. (*People v. Posey* (1980), 83 Ill. App. 3d 885, 404 N.E.2d 482.) Competency of counsel depends upon the total facts and circumstances of each case rather than a narrow focus upon isolated instances occurring during the course of trial. (*People v. Carter* (1980), 85 Ill. App. 3d 818, 407 N.E.2d 584; see also *People v. Murphy*.) Errors in judgment or trial strategy do not establish incompetency. (*People v. Murphy*; *People v. Carter*; *People v. Julian*.) Furthermore, defendant must establish that substantial prejudice resulted from counsel's incompetence, without which the outcome would probably have differed. *People v. Posey*.

A review of the record with these principles in mind indicates that defense counsel was adequately prepared for retrial and that defendant was competently represented. Prior to trial defense counsel filed numerous motions including a motion to suppress, two discovery motions, a motion to exclude testimony, a motion to compel fingerprinting of persons at the scene of the crime, and a motion to dismiss following the mistrial. At trial, counsel zealously advocated defendant's cause and conducted thorough direct and cross-examinations. There is no indication that defendant's counsel was unprepared for the second trial. He was the same at both trials. Consequently, he was in a unique position to judge which portions of the previous trial's transcript were necessary for the proper preparation of the second case. Defense counsel maintained trial notes during the first trial which were utilized during the second trial. Additionally, counsel's personal knowledge of the first trial undoubtedly

aided him in the preparation of the second trial. At most, defense counsel may have made an error in judgment as to the necessity for a complete transcript. However, an error in judgment does not establish incompetency. (*People v. Murphy*; cf. *People v. Williams* (1976), 63 Ill. 2d 371, 349 N.E.2d 14 (the failure to file a motion for discovery is not *per se* proof of either incompetency or ineffective assistance of counsel).) Finally, there is no indication that any material discrepancies existed in the testimony of any of the witnesses between the two trials. Nor has defendant alleged or shown that had defense counsel acquired a complete transcript the outcome would probably have differed. (*People v. Posey*.) Accordingly, we find this contention without merit.

### III.

Defendant next contends that he was not proved guilty beyond a reasonable doubt.

It is for the trier of fact to determine the credibility of witnesses, the weight to be given their testimony, and the inferences to be drawn from the evidence. (*People v. Akis* (1976), 63 Ill. 2d 296, 347 N.E.2d 733; *People v. Harris* (1972), 53 Ill. 2d 83, 288 N.E.2d 873.) In a bench trial the credibility of a witness is to be determined by the court whose judgment will not be set aside unless the proof is so unsatisfactory as to create a reasonable doubt of guilt. (*People v. Herron* (1979), 76 Ill. App. 3d 437, 395 N.E.2d 169; *People v. Nichols* (1975), 32 Ill. App. 3d 265, 336 N.E.2d 194.) Discrepancies or conflicts in the testimony generally affect only the weight to be given the testimony, and the trier of fact is free to accept or reject a witness' testimony. (*People v. Beasley* (1977), 54 Ill. App. 3d 109, 369 N.E.2d 260.) Similarly, contradictions between a witness' in-court statements and pretrial statements are properly matters of credibility for the trier of fact. (*People v. Hayes* (1979), 70 Ill. App. 3d 811, 388 N.E.2d 818; *People v. Ellis* (1976), 41 Ill. App. 3d 377, 354 N.E.2d 369.) It is well established that the identification by a single witness, who had ample opportunity for observation, is sufficient to sustain a conviction. *People v. Stringer* (1972), 52 Ill. 2d 564, 289 N.E.2d 631; see also *People v. Yarbrough* (1977), 67 Ill. 2d 222, 367 N.E.2d 666.

■■ In the instant case the complaining witness had an opportunity to observe defendant for approximately 25 minutes during which time she attempted to persuade defendant from harming her. After her attack she was able to give a general description of her assailant and the clothes he was wearing. She also made a positive identification of defendant from the police photo and at trial. Defendant argues that the victim's failure to detect the presence of the mustache and goatee which he claims to have had on November 6, 1977, and her failure to accurately judge her assailant's height, casts doubt on her identification. However, the failure to

detect the presence or absence of a mustache, or to describe attire with complete accuracy, are minor discrepancies and do not destroy the credibility of the witness. *People v. Smith* (1978), 59 Ill. App. 3d 480, 375 N.E.2d 941; *People v. Marbley* (1975), 34 Ill. App. 3d 434, 340 N.E.2d 247.

We have carefully reviewed the record and find that the inconsistencies alluded to by defendant are not sufficient to create a reasonable doubt as to defendant's guilt.

### IV.

Defendant next contends that the court incorrectly advised him that he could receive an extended term of imprisonment under the new sentencing code. He argues that he could not receive an extended term because the statute requires that two factors be present and only one was present here. He argues that the court's admonishment was a critical factor in his choice to be sentenced under the old code,[2] and that, therefore, his sentence must be vacated and the cause remanded for resentencing.

Section 5—8—2 of the Unified Code of Corrections provides:

> *"Extended Term.* (a) A judge shall not sentence an offender to a term of imprisonment in excess of the maximum sentence authorized by Section 5—8—1 for the class of the most serious offense of which the offender was convicted unless the *factors* in aggravation set forth in paragraph (b) of Section 5—5—3.2 were found to be present."[3] (Emphasis added.) Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2.

Section 5—5—3.2 provides:

> *"Factors in Aggravation.* \* \* \*.
> \* \* \*
> (b) The following factors may be considered by the court as reasons to impose an extended term sentence under Section 5—8—2 upon any offender who was at least 17 years old on the date the crime was committed:
> (1) When a defendant is convicted of any felony, after having been previously convicted in Illinois of the same or greater class felony, within 10 years, excluding time spent in custody, and such charges are separately brought and tried and arise out of different series of acts; or
> (2) When a defendant is convicted of any felony and the court finds that the offense was accompanied by exceptionally brutal or heinous behavior indicative of wanton cruelty." Ill. Rev. Stat. 1979, ch. 38, par. 1005—5—3.2.

---

[2] The code in effect on November 6, 1976.

[3] These provisions became effective February 1, 1978.

■■ Defendant contends that the use of the plural "factors" in paragraph 5—8—2 necessitates a finding that all the factors of subparagraphs (1) and (2) be present before an extended term may be imposed. Defendant concedes that the "factor" included in section 5—5—3.2(b)(2) may have been present, but argues that because this was defendant's first criminal conviction, the "factor" stated in section 5—5—3.2(b)(1) was not present. Therefore, an extended term could not be imposed. We disagree.

Several recent decisions have addressed this identical issue. Those cases have concluded that the use of the disjunctive "or" in section 5—5—3.2(b) indicates that an extended term may be imposed if the requirements of either subparagraphs (1) or (2) are found to be present. (*People v. Hamilton* (1980), 81 Ill. App. 3d 297, 401 N.E.2d 318; *People v. Butler* (1979), 78 Ill. App. 3d 809, 396 N.E.2d 1374; see also *People v. Gray* (1980), 87 Ill. App. 3d 142, 408 N.E.2d 1150.) It has also been recognized that both subparagraphs have several legal requirements and that neither represents a single factor. (*People v. Racinowski* (1979), 78 Ill. App. 3d 954, 397 N.E.2d 932.) Accordingly, the trial court properly advised defendant of the possibility of being sentenced to an extended term under section 5—8—2 of the Unified Code of Corrections. Ill. Rev. Stat. 1979, ch. 38, par. 1005—8—2.

## V.

Finally, defendant contends that his sentence of 50 to 75 years was excessive and should be reduced. He argues that the sentence was not justified in light of the purpose of incarceration which is to restore the offender to useful citizenship (Ill. Const. 1970, art. I, §11) and the fact that this was his first conviction.

■■ While Supreme Court Rule 615(b)(4) grants a reviewing court the power to reduce the sentence imposed by the trial court (Ill. Rev. Stat. 1977, ch. 110A, par. 615(b)(4)), it does not address the circumstances under which this power should be exercised. However, decisional law has firmly established that absent an abuse of discretion, the sentence of the trial court will not be altered. *People v. Lykins* (1979), 77 Ill. 2d 35, 394 N.E.2d 1182; *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.

In the instant case, the court was charged with the difficult task of balancing the heinous nature of the crime against defendant's lack of a criminal record. (See *People v. Smith* (1978), 59 Ill. App. 3d 480, 375 N.E.2d 941.) The record reveals that the trial judge reached his decision after considering the seriousness of the crime, the exceptionally brutal nature of the attack, defendant's age and previously good background.

■■ The judge, while recognizing that the sentence was for a substantial period of time, felt it was necessary to protect the public. The trial judge is normally in a better position than a reviewing court to assess and weigh

all the factors relevant to the sentence. (*People v. Day* (1979), 76 Ill. App. 3d 571, 394 N.E.2d 1378; see also *People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882; *People v. Smith.*) While it is true that defendant had no prior record, considering the brutality and seriousness of this crime, it cannot be said that the sentence imposed constituted an abuse of discretion. Compare *People v. Gerecke* (1977), 45 Ill. App. 3d 510, 359 N.E.2d 1178 (sentence of 50 to 100 years for attempt murder held not excessive); *People v. Watson* (1979), 76 Ill. App. 3d 931, 395 N.E.2d 682 (sentence of 25 to 75 years for attempt murder held not excessive).

For the reasons stated, the judgment of the trial court is affirmed.

Affirmed.

SULLIVAN, P. J., and LORENZ, J., concur.