THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JAMES HEBEIN, Defendant-Appellant.

First District (5th Division)   No. 79—1536

Opinion filed December 30, 1982.

Steven Clark and Richard E. Cunningham, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat, David A. Stoioff, and LuAnn Rodi, Assistant State's Attorneys, of counsel), for the People.

PRESIDING JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted of murder and sentenced to a term of 20 to 40 years. He contends on appeal that (1) the trial court erred in refusing to give his tendered instruction on the consequences of a verdict of not guilty by reason of insanity; (2) refusal to give an instruction on voluntary manslaughter denied him due process when there was evidence of a mutual quarrel and combat; (3) he was denied a fair trial (a) by improper cross-examination of defendant's expert witness and (b) by improper, inflammatory remarks during closing arguments; (4) his sentence should be reduced because it is grossly disparate from that of his codefendant; (5) all statements made by defendant were erroneously admitted where his first statement was obtained in violation of his constitutional rights and all subsequent statements were fruits thereof; and (6) he was denied effective assistance of counsel.

Defendant and Steven Johnson were charged by information with

the murder of Brian Pillar. Johnson subsequently pleaded guilty and was sentenced to a term of 14 years to 14 years and 1 day. Defendant's first trial resulted in a mistrial when the jury was unable to reach a verdict.

On the retrial, Laura Reed testified that she had been dating defendant for approximately two years when, on December 4, 1976, he and Brian Pillar came to her place of employment, and she went with defendant to his apartment; then when Pillar and Johnson came in later, they began arguing and defendant told them to go outside if they wanted to fight; that when they continued arguing, defendant threw a knife on the floor between them and told Pillar to use it; that Johnson picked up the knife, placed it on Pillar's lap, and offered to fight him for it; that after Pillar put the knife back on the floor, defendant and Johnson pulled him into the hallway where Johnson began to "stomp" (kick) him while defendant watched; then after three or four minutes of stomping, the two men dragged Pillar out of the building and down the street; that later, when police officers questioned her about the fight, she took them to defendant's apartment, and when defendant and Johnson returned, defendant told the officers that Pillar had stolen $20 and he (defendant) had chased him to recover it; that after the police left, defendant told her he had never killed anyone before and sent her out for coffee while he and Johnson went back to move Pillar's body; that later the police returned and, after arresting her, defendant, and Johnson then took her to the alley where she saw Pillar's body; that she had never noticed anything unusual about defendant during the two years she had known him, and after the killing he looked and spoke normally; and that in her opinion he was sane and knew what he was doing.

On cross-examination, Reed said that although she had also been charged with murder she was offered nothing in exchange for her testimony; that defendant seemed normal and happy that evening and that he remained calm and took no part in the argument between Pillar and Johnson.

Cathy Groves testified that she and defendant were good friends; that while defendant was jealous of Pillar's attention to Reed, they otherwise appeared to get along well; that she had never observed defendant do anything unusual; and that in her opinion he was sane.

Officer Hyland testified that when he responded to a call of a battery in progress, he found traces of blood in the hallway outside defendant's apartment; that he was talking to Reed in the apartment when defendant and Johnson entered; that defendant told him he, Johnson, and Pillar fought over rent money allegedly taken by Pillar;

that later, after other officers discovered Pillar's body in a nearby alley, he arrested defendant, Johnson, and Reed; that defendant admitted stabbing Pillar in the back, stomach, and neck; that he was with defendant for approximately two hours immediately after Pillar's death; and that in his opinion defendant was sane.

Assistant State's Attorney Reid testified that defendant was advised of his rights and, after waiving them, gave a statement which was transcribed; that defendant read the statement and signed it; that Johnson gave a similar statement; and that he (Reid) was of the opinion, based on his observation, that defendant was sane, able to appreciate the criminality of his acts, and able to conform his conduct to the law.

The written statement of defendant was received in evidence, and in it he stated that he, Johnson, and Pillar, after drinking in his apartment, went to pick Reed up at her place of employment; that he and Reed returned immediately to his apartment, and Johnson and Pillar came in later; that Johnson began calling Pillar names and accused him of being afraid to fight; that he provided a knife for them to use in their fight, but Pillar put it aside; that he finally told them to go outside and fight, and when Pillar refused, he (defendant) and Johnson pulled Pillar out of his chair and Johnson pushed him into the hall; that when he (defendant) entered the hall, Pillar was on the floor and Johnson was kicking him; that he attempted to help Pillar up and when he (Pillar) swung at him, he hit Pillar—knocking him to the floor; that he and Johnson picked Pillar up and guided him to the front door; that Pillar fell going down the stairs and, after they helped him up, Pillar ran away from them; that he (defendant) threw a knife which struck Pillar in the back, causing him to fall; that he pulled the knife from Pillar's back and stabbed him in the stomach and throat while Johnson looked on; that he threw the knife away before he and Johnson ran back to the apartment; that he told Reed he killed Pillar, and later he and Johnson returned to Pillar's body to remove identification and move it to a gangway; and that he then returned to the apartment where he cleaned up the blood in the hall.

Sergeant Merritt testified to an oral statement made by defendant which was essentially the same as the written statement, except he told Merritt that he and Johnson had punched Pillar while in the apartment and both had kicked and beat Pillar and had thrown him down the stairs before dragging him from the building. Merritt further testified defendant told him that after he struck Pillar in the back with the knife, he and Johnson hit him a few more times before he (defendant) stabbed Pillar in the face and stomach to make sure he

was dead; and that during the entire interview defendant was lucid, coherent, and, in Merritt's opinion, sane.

For the defense, Charles Johnson of the Department of Children and Family Services (DCFS) testified, from the records in his keeping, that as a child defendant had been placed in several foster homes and was in various residential institutional facilities for emotional problems.

Sergeant Merritt, recalled by the defense, testified to a statement of Johnson that he and Pillar, before going to defendant's apartment that evening, went to a fish and chips restaurant where, to get even with the manager for throwing them out earlier that evening, they knocked over the cash register and chased the manager and employees from the restaurant, and that he (Johnson) had a knife which he gave to decedent after they left the restaurant.

Shirley Bernhardt, defendant's mother, testified that her brother suffered from hydroencephalitis; that one of her five other sons had severe brain damage, another had emotional problems, and a third was a deaf mute; that when she saw defendant in jail the morning after the killing, he was crying, confused, and did not remember the killing nor the fight preceding it; that both she and her ex-husband had physically abused defendant as a child and, as a result, he did not have a good relationship with his father; that the family moved frequently during defendant's early childhood; that defendant had trouble in school which led to his placement in classes for the educably mentally handicapped; that when he still did not make progress, he was sent, at the age of 10, to Boys Town, where he resided for three years; that upon his return, he was placed in a temporary foster home for one year; and that later he was again placed in a foster home. She stated also that while defendant was with her, he caused problems with her other children; but that, in her opinion, he was sane and knew right from wrong. She said, however, that she thought defendant was mentally disturbed and had taken him to a psychiatrist, but he was never institutionalized.

Carol Domroese, a learning disabilities resource teacher in the Oak Park school system, testified that when defendant was in her class during the 1972 school year, his IQ was in the seventies, and he could not cope with a regular classroom situation; that an educably mentally handicapped child can learn reading and mathematics to a certain level; and that defendant was able to secure and hold a job as a busboy. She acknowledged that other test scores indicated defendant's IQ was 88; that his common sense level was at a par with other children his age; and that in her opinion he was sane but had diffi-

culty adjusting to certain situations, particularly those involving his immediate family.

Elmer Smith, a psychologist for the Chicago Board of Education, testified that records in his keeping indicated that because defendant's IQ was 72 at the age of seven, it was recommended he be placed in classes for the educably mentally handicapped, and that defendant had emotional or adjustment problems which interfered with full and effective function. He also stated that IQ scores indicate nothing about ability to conform to law and appreciate the criminality of acts; that being educably mentally handicapped does not mean that a person is insane; and that such a person can function in and contribute to society, including holding a job and forming meaningful relationships.

DCFS reports admitted into evidence indicated that defendant's home life was troubled due to his father's alcoholism; that because of his parent's constant arguing, there was much tension in the home; that defendant failed first grade and was described by his mother as indifferent and unmotivated for learning; that he had behavior problems and was jealous of attention given the other children; that all of the children suffered from varying degrees of emotional disturbance; that there were problems with defendant stealing—mostly from the family, lying, and abusing his siblings; that while with a foster family, he took their van without permission and struck two other cars; and that he stole money from his foster parents, which resulted in his removal from their home.

Julie Hansen, a social worker for the DCFS, testified that defendant was rejected by his family and suffered a great deal of physical and emotional abuse from them; that at age 13 he had severe emotional problems stemming from his family situation, was withdrawn, passive, and had difficulty relating to people; and that he was referred from residential treatment.

Dr. Marvin Schwartz, a Board-certified psychiatrist, testified that he had interviewed defendant and reviewed his records and it was his opinion that defendant suffered from schizophrenia, latent type, resulting in a poor sense of reality and abnormal emotional responses such that, while he could appreciate the criminality of his acts, he was unable to conform his conduct to the standards of the law and control his behavior. Dr. Schwartz admitted that he had only a single interview with defendant, lasting less than one hour, and in prior testimony he had described defendant's grasp of reality as good.

In rebuttal, Assistant State's Attorney Michael Robbins testified that he listened to a telephone conversation between the prosecutor and Dr. Schwartz with the knowledge and permission of both, in

which Dr. Schwartz indicated that defendant's grasp of reality was good; that he had not seen the Psychiatric Institute's reports; and that his ultimate diagnosis at trial could depend on the cleverness of the lawyer's hypothetical question. Robbins admitted, however, that the conversation occurred several months before trial and that he had made no notes on it.

Dr. Frederick Gibbs, a psychiatrist, testified that there was no indication of organic brain damage or brain malfunction in defendant's EEG. He acknowledged, however, that a normal EEG does not, of itself, negate brain damage and had he known that one of defendant's brothers suffered from brain damage and another was a deaf mute, that he might have recommended further neurological tests.

Dr. Robert Reifman, a court-appointed psychiatrist, testified that he had examined defendant in April 1977 to determine his fitness for trial; that he found he had an antisocial personality, which is not a mental disease or defect but a diagnosis of personality structure; that defendant did not suffer from schizophrenia-type psychosis; that he examined him again in July 1977, after further information had been obtained; that he again diagnosed antisocial personality; that he found defendant had an adequate and normal grasp of reality, did not then suffer from any mental disease or defect, and could not then be classified as a chronic schizophrenic; and that, in his opinion, he could conform his conduct to the requirements of the law at the time of the killing.

Opinion

Defendant first asserts error in the refusal to instruct the jury on the consequences of a verdict of not guilty by reason of insanity. He acknowledges that in *People v. Meeker* (1980), 86 Ill. App. 3d 162, 407 N.E.2d 1058, this court held that, as a general rule, such an instruction should not be given. However, he asked that we find special prejudicial circumstances existed here which required giving the proffered instruction.

In *Meeker*, we noted that the vast majority of jurisdictions do not permit any instruction on the result of a not guilty by reason of insanity verdict, and set forth at length are reasons for adhering to the majority rule. (See also *People v. Upshaw* (1981), 103 Ill. App. 3d 690, 431 N.E.2d 1138.) However, as defendant correctly notes, in *Meeker* we expressly reversed the question whether "special circumstances in a given case might warrant giving an instruction on the consequences of a verdict of not guilty by reason of insanity." 86 Ill. App. 3d 162, 171, 407 N.E.2d 1058, 1066.

Defendant likens this case to the situation in *Dipert v. State* (1972), 259 Ind. 260, 286 N.E.2d 405, the case in which the exception noted in *Meeker* was developed. There, a prospective juror asked what would happen if the defendant were found not guilty by reason of insanity, and the prosecutor stated that he would go "scot-free." Defendant objected, but his request for a curative instruction was denied. The Indiana Supreme Court reversed, noting that "in view of the scanty evidence as to the sanity of the defendant, the remarks of the Prosecuting Attorney may have had an improper influence on the jurors." (259 Ind. 260, 262, 286 N.E.2d 405, 406.) The court then formulated the following exception:

> "Normally, a defendant, interposing a defense of not guilty by reason of temporary insanity, is not entitled to an instruction as to what post-trial procedures are available to determine whether he should be released or subject to confinement in a mental institution. [Citation.] At the same time, however, a defendant, through an appropriate channel, such as a curative instruction or statement by the judge, will be entitled to inform the jury of such procedures where an erroneous view of the law on this subject has been planted in their minds." 259 Ind. 260, 262, 286 N.E.2d 405, 407.

*Dipert* specifically limited its decision to the facts before it, and subsequent Indiana cases[1] have continued to narrowly construe this exception. Thus, no instruction is required there unless the statement complained of is a direct comment on the ultimate disposition of the case in the event of a not guilty by reason of insanity verdict. (*Blake v. State* (1979), 271 Ind. 75, 79, 390 N.E.2d 158, 162.) In *Blake*, a psychologist was asked what would happen if defendant were released immediately. He answered that the same kind of problems (*i.e.*, criminal acts) would occur. The court found that this exchange did not require a curative instruction under *Dipert*, for there was no direct comment on the consequences of a not guilty by reason of insanity verdict.[2]

In the instant case, defendant argues that the remarks in question "implied" that defendant would be set free, rather than being direct comments on the consequences of an acquittal by reason of insanity. The only allegedly direct comment occurred during the State's rebut-

---

[1]Defendant has not cited, nor has our own research discovered, any other jurisdiction which has adopted this rule.

[2]The same question was previously raised, but not decided, in *Johnson v. State* (1977), 265 Ind. 689, 359 N.E.2d 525.

tal closing argument, when the prosecutor stated, "Is that why you are supposed to cut him loose, because they did something in the fish store. [*Sic.*]" Defendant argues that the term "cut him loose" explicitly told the jury he would be released unless he was found guilty. Read in context, this statement was clearly directed at defendant's insinuation, during closing, that Johnson was the killer, as well as his attempt to portray the decedent as a violent person, a matter entirely irrelevant to defendant's guilt or sanity. Other comments by the prosecutor, which defendant insists implied that he would be released if found insane, actually sought to impress upon the jury that emotional problems or "sickness" do not equate with legal insanity, contrary to the implication of the defense presented.

Defendant further complains that the court injected into the trial the irrelevant issue of punishment, first by informing the venire that this was not a capital case, then, during questioning of the first prospective juror, by characterizing a successful insanity defense as barring any criminal punishment. We fail to see how these remarks could give rise to an erroneous impression of the law, even by implication. Furthermore, they fall far short of the direct comment found prejudicial in the cases cited.

Finally, defendant argues that the implication was raised by two questions posed by the prosecutor to each expert witness: (1) whether defendant was dangerous to society; and (2) whether, if released, he would kill again. We find these questions almost identical to those found not to be prejudicial in *Blake*. Here, too, they were relevant to defendant's sanity, rather than a direct comment on the disposition of the case should defendant be found insane.

■ Thus, even if we were to adopt the exception urged upon us by defendant, the narrow parameters thereof would not encompass the situation before us, since there was no direct comment on the consequences of a verdict of not guilty by reason of insanity. Furthermore, assuming that the comments cited by defendant mandated giving of the tendered instruction, the failure to do so would not necessarily constitute reversible error. A judgment is never reversed merely because error has been committed, for defendants are guaranteed, not an error-free trial, but a fair one. (*People v. Robinson* (1979), 68 Ill. App. 3d 747, 386 N.E.2d 559.) Therefore, it must appear that real justice has been denied, or that the finding of guilty may have resulted from such error (*People v. Brown* (1982), 104 Ill. App. 3d 1110, 433 N.E.2d 1081), and any error in giving or refusing to give instructions is harmless where the evidence is so clear and convincing that the jury's verdict could not have been different (*People v. Geno-*

*vese* (1978), 65 Ill. App. 3d 819, 382 N.E.2d 872, *cert. denied* (1979), 444 U.S. 843, 62 L. Ed. 2d 56, 100 S. Ct. 86; *People v. Jones* (1972), 5 Ill. App. 3d 926, 284 N.E.2d 404). We therefore must consider whether there is a reasonable possibility that the alleged error might have contributed to the jury's finding. *People v. Hairston* (1980), 86 Ill. App. 3d 295, 408 N.E.2d 382.

Defendant maintains that failure to give his tendered instruction could not be harmless in the light of his troubled background, the bizarre nature of his involvement in the killing, and Dr. Schwartz' opinion that he could not then conform his conduct to the requirements of the law due to schizophrenia. However, while we agree that testimony established that defendant suffered from emotional problems as a result of his childhood experiences and was, if not mentally retarded, of marginal intelligence, these factors are insufficient to satisfy the stringent test of legal insanity. Moreover, his actions at the time in question are totally consistent with the diagnosis of antisocial personality, which all expert witnesses agreed is not a form of mental disease or defect. Dr. Schwartz was the only witness of the opinion that defendant was legally insane; however, he was engaged by defendant, and his testimony was seriously undermined when he admitted that on two prior occasions he had stated, contrary to his diagnosis at trial, that defendant had a good grasp of reality. Moreover, Dr. Schwartz admitted that, in previous testimony, he had been unable to say whether defendant was legally insane at the time in question.

On the other hand, the State presented overwhelming evidence of defendant's legal sanity. Every person who testified to defendant's early development—his mother, girl friend, friend, teacher, and social worker—expressed the opinion that he was sane. Each witness who had contact with defendant within hours of the incident—Officer Hyland, Sergeant Merritt, Assistant State's Attorney Reid—shared that opinion. Finally, a court-appointed psychiatrist testified that defendant understood the criminality of his acts and could conform his conduct to the standards of law. In the light of this evidence, we are convinced that, even if refusal to give defendant's tendered instruction were error, reversal would not be required.

Defendant next contends that the evidence of mutual quarrel and combat required an instruction on voluntary manslaughter.

Section 9—2 of the Criminal Code of 1961 (Ill. Rev. Stat. 1975, ch. 38, par. 9—2) provides in relevant part that "[a] person who kills an individual without lawful justification commits voluntary manslaughter if at the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by: (1) the individual killed

\*\*\*." It is well settled that, if there is evidence which, if believed, would reduce the crime to manslaughter, an instruction thereon must be given; but if there is no evidence supporting a verdict of manslaughter, no instruction should be given. (*People v. Lockett* (1980), 82 Ill. 2d 546, 413 N.E.2d 378.) Thus, to support an instruction in this case, there must be evidence of serious provocation of defendant by the victim such as to arouse intense passion in the former, for no matter how violent defendant's passion, no manslaughter instruction is mandated unless it was caused by provocation which the law recognizes as reasonable and adequate. *People v. Strange* (1980), 81 Ill. App. 3d 81, 400 N.E.2d 1066.

Mutual quarrel or combat is among the recognized forms of serious provocation (*People v. Strong* (1979), 79 Ill. App. 3d 17, 398 N.E.2d 216), but the combat must be "one into which both parties enter willingly, or in which two persons, upon a sudden quarrel and in hot blood, mutually fight on equal terms" (*People v. Hudson* (1979), 71 Ill. App. 3d 504, 510, 390 N.E.2d 5, 9). Therefore, mere words or trespass to property do not constitute sufficient provocation (*People v. Strong* (1979), 79 Ill. App. 3d 17, 398 N.E.2d 216), nor is there mutual combat where a victim is surrounded and subjected to a beating by multiple persons over an extended period of time (*People v. Handley* (1972), 51 Ill. 2d 229, 282 N.E.2d 131, *cert. denied* (1972), 409 U.S. 914, 34 L. Ed. 2d 175, 93 S. Ct. 247). Furthermore, the provocation must be proportionate to the retaliation it generates, and if a victim is attacked and killed with a violence out of all proportion to the provocation, a verdict of manslaughter would not be justified (*People v. Miller* (1981), 96 Ill. App. 3d 212, 421 N.E.2d 406), and no instruction thereon should be given (*People v. Simpson* (1978), 74 Ill. 2d 497, 384 N.E.2d 373).

Here, in support of his contention that there was mutual combat, defendant points to the argument between Pillar and Johnson and the kicking of Pillar by Johnson. However, in order to be entitled to the requested instruction, defendant must have acted "under a sudden and intense passion," and we find no evidence of passion on defendant's part; in fact, he concedes that during the argument he remained calm and did not participate. In addition, it appears that Pillar remained silent throughout, and in his written statement defendant himself said that the argument was originally provoked by Pillar's criticism of Johnson. Furthermore, even if defendant were inflamed by the argument between Johnson and Pillar, mere words—no matter how abusive—are insufficient to mandate a voluntary manslaughter instruction, for they do not amount to mutual combat. *People v.*

*Strange* (1980), 81 Ill. App. 3d 81, 400 N.E.2d 1066.

Finally, defendant notes the fact that Pillar swung at him, arguing that this is further evidence of provocation. However, it appears that this testimony came only from defendant and is the only evidence that Pillar made any move to fight back against his attackers. While defendant asserts that he was trying to help Pillar at the time, it is doubtful that Pillar, after being dragged from the apartment and repeatedly kicked in the head for three to four minutes, was able to distinguish friend from foe. This action alone is insufficient to constitute mutual combat.

Moreover, mutual combat requires that there be a mutual fight on equal terms, entered into willingly by both parties. Throughout, Pillar refused to engage in physical combat, and "equal terms" does not encompass a situation where two parties, one armed with a knife, attack an unarmed, unwilling, fleeing "combatant." Furthermore, the provocation here, if any, was out of all proportion to the response it generated. The evidence indicates that Johnson and defendant were provoked because Pillar, after his initial remarks critical of Johnson, refused to fight; in fact, he was killed attempting to run away from a fight. Stated quite simply, it appears that Pillar was killed, not because he engaged in mutual combat, but because he refused to do so.

Defendant further contends that the prosecutor's improper conduct in cross-examination and his inflammatory remarks during closing argument deprived him of a fair trial. He argues also that the prosecutor harassed his expert witness with irrelevant questions that undermined the witness' credibility, improperly impeached the expert witness on collateral matters, and—in closing argument—stated his opinion on the evidence, argued facts not in evidence, suggested the defense was a sham, and revealed to the jury that Johnson confessed and was currently in prison. The State maintains that these alleged improprieties have been waived by defendant's failure to object to most of them and to raise any of them in his post-trial motion.

The issue is waived for purposes of review if a defendant fails to object to allegedly improper cross-examination (*People v. Anderson* (1981), 93 Ill. App. 3d 646, 417 N.E.2d 663), impeachment (*People v. Davis* (1982), 106 Ill. App. 3d 260, 435 N.E.2d 838), or prosecutorial remarks during closing argument (*People v. Toth* (1982), 106 Ill. App. 3d 27, 435 N.E.2d 748), or to raise them in a post-trial motion (*People v. Turner* (1981), 93 Ill. App. 3d 61, 416 N.E.2d 1149). Furthermore, even if objections to the prosecutor's conduct are made during trial, failure to include them in a post-trial motion constitutes waiver. *People v. Fowler* (1981), 98 Ill. App. 3d 202, 423 N.E.2d 1356.

Defendant agrees that there were few objections made to the alleged improprieties, and that he failed to raise any of them in his post-trial motion; in effect, he concedes that they were waived. However, he asserts that they must be considered under the plain error rule, which allows us to consider an issue otherwise waived (*People v. Smith* (1981), 93 Ill. App. 3d 26, 416 N.E.2d 814), if "the error *** is so prejudical that real justice has been denied or the verdict of the jury may have resulted from such error" (*People v. Kincy* (1982), 106 Ill. App. 3d 250, 258, 435 N.E.2d 831, 837).

None of the allegedly improper conduct appears to be of such a substantial nature as to mandate consideration under the plain error rule, particularly in the light of the overwhelming evidence of defendant's guilt, as well as of his sanity at the time of the killing. Furthermore, even if defendant had not waived these questions, we are not persuaded that all of the conduct of which he complains was improper. In particular, the cross-examination and impeachment of Dr. Schwartz was well within the bounds of propriety. Defendant's only complaint is that they served to undermine the witness' credibility with the jury; but that is precisely why the matters were important, since the credibility of all witnesses, including experts, is a matter to be determined by the jury (*People v. Martin* (1980), 87 Ill. App. 3d 77, 409 N.E.2d 114), and it is perfectly proper for the prosecutor to bring to the jury's attention weaknesses in the factual basis of an expert's opinion (*People v. Romaine* (1979), 79 Ill. App. 3d 1089, 399 N.E.2d 319). Finally, many of the allegedly improper remarks in the prosecutor's rebuttal closing argument are unobjectionable because they were either invited by defendant (*People v. Boyd* (1980), 88 Ill. App. 3d 825, 410 N.E.2d 931) or constituted reasonable inferences from the evidence (*People v. Hairston* (1970), 46 Ill. 2d 348, 263 N.E.2d 840).

Defendant next contends that there is no basis for the gross disparity between his sentence (20 to 40 years) and that of his codefendant (14 years to 14 years and a day), and asks that we reduce his sentence to 14 to 20 years.

While the trial court's decision is normally given great weight in considering the propriety of the sentence imposed (*People v. Jackson* (1981), 100 Ill. App. 3d 1064, 427 N.E.2d 994), codefendants should not receive disparate treatment in sentencing (*People v. Cowherd* (1978), 63 Ill. App. 3d 229, 380 N.E.2d 21) unless they are not similarly situated with regard to rehabilitative potential (*People v. Jackson*) or nature and extent of participation in the offense (*People v. Godinez* (1982), 91 Ill. 2d 47, 434 N.E.2d 1121).

Initially, we note that there is nothing in this record from which

we can determine whether defendant and Johnson were similarly situated with regard to rehabilitative potential. Both were 18 years old when the crime was committed, and while it appears that defendant was a first offender, we do not have before us a presentencing report on either, nor do we know Johnson's criminal history, if any. Moreover, it appears that the disparate sentence was justified by the difference in the nature and extent of their participation in the offense.

Defendant likens this case to *People v. Gleckler* (1980), 82 Ill. 2d 145, 411 N.E.2d 849, where the court found defendant's death sentence impermissibly disparate with his codefendant's sentence of imprisonment. In that case, defendant, who was described as a man with no criminal history, a drinking problem, and "the personality of a doormat," was riding in a car with his two codefendants when Parsons (one of the codefendants), stopped another car and ordered its two occupants out. After the codefendants shot the occupants, defendant "finished them off," either at the compulsion of Parsons or to end the victims' obvious suffering, depending on which of defendant's versions of the occurrence was believed. The court vacated defendant's death sentence after finding that Parsons was at least as culpable as defendant, stating:

> "Parsons first shot the victims in the back with the intent to kill them and was convicted of the double murders. It was Parsons who made the apparently unilateral decision to force the victims off of the road and who first ordered them out of their car. And if Gleckler's compulsion evidence were believed, there would be no doubt that Parsons was more culpable than Gleckler." 82 Ill. 2d 145, 166, 411 N.E.2d 849, 859.

Defendant maintains that the evidence shows Johnson was the ringleader here, just as Parsons was in *Gleckler*. However, we note that, unlike *Gleckler*, Johnson did not participate in the actual murder, nor is there any evidence that he instigated the escalation from a fistfight to murder with a deadly weapon; in fact, it was defendant who introduced the weapon into this altercation. In addition, although there is testimony that Johnson had leadership ability, was larger than defendant, and had a more forceful voice, there is no evidence of compulsion, as there was in *Gleckler*, nor even that Johnson suggested that Pillar be murdered.

■ We find this case is more analogous to *People v. Dowd* (1981), 101 Ill. App. 3d 830, 428 N.E.2d 894, where the court found imposition of a greater sentence on one codefendant justified on a finding that the one who carried out the physical act of murder was more culpable. In that case, the court also noted that the defendant was the

moving force behind the murder plot and supplied the necessary physical means to carry it out. Here, defendant escalated the altercation to murder and supplied the weapon, in addition to committing the actual physical act of murder. Therefore, we cannot say that his greater sentence was unjustified.

Defendant next contends that the trial court erred in failing to suppress his first incriminating statement made orally to Officer Hyland, arguing the State had failed to show that he made a knowing and intelligent waiver of his rights pursuant to *Miranda v. Arizona* (1966), 384 U. S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. He further asserts that his subsequent statements must also be suppressed as fruits of this allegedly unlawfully-obtained initial statement.

While it is true that the State bears the burden of demonstrating that a defendant has been warned of his constitutional rights and waived them (*Miranda v. Arizona*), the findings of the trial court on this issue will not be overturned unless contrary to the manifest weight of the evidence (*People v. Willis* (1975), 26 Ill. App 3d 518, 325 N.E.2d 715), and although a valid waiver will not be presumed from silence (*People v. Rodriguez* (1981), 96 Ill. App. 3d 431, 421 N.E.2d 323), it may be found by examination of the totality of the circumstances surrounding a statement (*People v. Baer* (1974), 19 Ill. App. 3d 346, 311 N.E.2d 418) and is properly found where a defendant has been advised of his *Miranda* rights and has acknowledged understanding them prior to making a statement (*People v. Genus* (1979), 74 Ill. App. 3d 1002, 393 N.E.2d 1162).

■ Here, there was evidence in the record from which the trial court could have concluded that defendant was informed of his rights and acknowledged understanding them.[3] However, defendant argues this warning and acknowledgment occurred some time before the statement in question, with no showing of a further warning and waiver at the time of interrogation. We see no merit to this argument, since once a waiver has been obtained, there is no need to repeat the warnings at each successive interview. A similar argument

---

[3]At a pretrial suppression hearing, Officer Hyland testified that defendant acknowledged understanding his rights when they were recited to him at the time of his arrest, although the acknowledgement was not mentioned at trial before Judge Strayhorn. We consider here the testimony at the pretrial motion to suppress in addition to the trial testimony, since defendant was collaterally estopped from relitigating the motion to suppress already denied by Judge Moran on February 21, 1978, in the absence of additional evidence or exceptional circumstances (*People v. Douglas* (1981), 100 Ill. App. 3d 181, 426 N.E.2d 950), and declaration of a mistrial did not vitiate the effect of that ruling (*People v. Henderson* (1976), 36 Ill. App. 3d 355, 344 N.E.2d 239).

was considered and rejected in *People v. Patton* (1980), 90 Ill. App. 3d 263, 412 N.E.2d 1097, where a defendant was advised of his rights and acknowledged understanding them at the time of his arrest, but this procedure was not repeated when he made an oral statement 20 minutes later, nor when he made a written statement approximately 2½ hours later. In the instant case, it appears that the statement was made within one hour of defendant's arrest. Testimony at the pretrial suppression hearing established that defendant's second statement, made to Inspector Merritt after being informed of his *Miranda* rights and waiving them, occurred within 45 minutes to one hour of defendant's arrest. It follows therefrom that defendant's first statement must have occurred within the same time period.

■ Defendant also points to other circumstances in arguing the absence of a knowing and intelligent waiver, in particular that he was not offered the opportunity to make a phone call; that he was 18 years old, classified as educably mentally handicapped, with an IQ of 77, and had not been educated beyond the 10th grade; and that he was confronted with the statements of Johnson and Reed before his statement was elicited. We note that nothing in the record before us indicates that defendant asked to make a phone call, nor has he cited any case which requires an officer to make a spontaneous offer of this opportunity. Furthermore, we have found knowing, intelligent waiver where defendants had mental capacities and educational backgrounds similar to defendant's (*People v. Marek* (1980), 92 Ill. App. 3d 746, 415 N.E.2d 1230; *People v. Avery* (1980), 88 Ill. App. 3d 771, 410 N.E.2d 1093), and it is not a *Miranda* violation to reveal incriminating evidence against a defendant in eliciting a statement (*People v. Colley* (1980), 83 Ill. App. 3d 834, 404 N.E.2d 378), including revelation of the fact that a codefendant has made a statement implicating him in a crime (*People v. Smith* (1981), 93 Ill. App. 3d 1133, 418 N.E.2d 172). Therefore, we find nothing in the circumstances before us requiring suppression of defendant's initial incriminating statement.

■ Moreover, even assuming arguendo that defendant's first statement should have been suppressed, it does not necessarily follow that subsequent voluntary statements are also inadmissible. (*People v. Colley* (1980), 83 Ill. App. 3d 834, 404 N.E.2d 378.) In *People v. Burris* (1971), 49 Ill. 2d 98, 273 N.E.2d 605, the defendant argued that a later statement should have been suppressed because it was the product of an earlier statement made prior to proper *Miranda* warnings. The supreme court rejected the argument, noting:

"[Defendant] did not testify that the subsequent written statement was in any way the product of any previous interrogation or that he felt compelled to give a written statement because of anything he may have previously said to the detective. It would appear that if the written statement had in any way been influenced by any previous interrogation or conduct, the defendant would have given some testimony from which such an inference could have been drawn. We conclude that the written statement was properly admitted into evidence." (49 Ill. 2d 98, 104, 273 N.E.2d 605, 609-10.)

In more recent cases, we have relied on *Burris* in finding that subsequent statements need not be suppressed absent evidence that the defendant made them because he had already given the first (*People v. Tankson* (1980), 92 Ill. App. 3d 328, 415 N.E.2d 1218; *People v. Andrus* (1976), 37 Ill. App. 3d 533, 346 N.E.2d 435), *i.e.*, because he thought that the first statement conclusively established his guilt, even where the subsequent statement was made to the same police authority only a short time after improper questioning and while defendant was continuously in custody (*People v. Principato* (1981), 95 Ill. App. 3d 230, 419 N.E.2d 1230). In the instant case, there is no evidence that defendant was induced to give the later statements, for which valid waivers were admittedly obtained, because he believed that the earlier statement conclusively established his guilt. Therefore, in the absence of any showing of a connection between the statements, we find that, even if defendant's first statement were inadmissible, it would not have required suppression of his subsequent statements.

Defendant's final contention is that he was denied effective assistance of counsel. He supports his position by alleging that his appointed counsel failed to (a) exercise a peremptory challenge against a juror he recognized as prejudiced; (b) call four witnesses who testified in defendant's behalf at his first trial; (c) timely seek a neurological examination; (d) call Officer Hyland before trial to prove a *Miranda* violation; and (e) take any action after being appointed appellate counsel, which resulted in an earlier dismissal of this appeal and several years of delay. In response, the State asserts that defense counsel's performance at trial surpassed the required standards of effective assistance, and that defendant's conviction resulted from the overwhelming evidence of his guilt rather than counsel's performance.

While an accused has the right to effective assistance of counsel in State criminal proceedings pursuant to the sixth and fourteenth amendments of the United States Constitution (U.S. Const., amends.

VI, XIV; *People v. Knippenberg* (1977), 66 Ill. 2d 276, 362 N.E.2d 681), he is entitled to competent, not perfect, representation (*People v. Berland* (1978), 74 Ill. 2d 286, 385 N.E.2d 649, *cert. denied* (1979), 444 U.S. 833, 62 L. Ed. 2d 42, 100 S. Ct. 63); thus, it has been held that review of trial counsel's performance will not extend to areas involving the exercise of judgment, trial tactics, or strategy, even where appellate counsel or the reviewing court might have acted differently (*People v. Smith* (1980), 81 Ill. App. 3d 764, 401 N.E.2d 1017), and that we will consider the totality of the circumstances in determining the competency of counsel, rather than focusing on isolated instances during trial (*People v. Davis* (1981), 103 Ill. App. 3d 792, 431 N.E.2d 1210). Therefore, in order to establish a violation of his constitutional rights, defendant must show, within the above limitations, that his appointed counsel was actually incompetent in carrying out his duties as a trial attorney, resulting in substantial prejudice without which the outcome probably would have been different (*People v. Carlson* (1980), 79 Ill. 2d 564, 404 N.E.2d 233), but he may not rely on mere conjecture nor speculate as to the outcome of his case had representation been of higher quality (*People v. Hills* (1980), 78 Ill. 2d 500, 401 N.E.2d 523).

Turning to defendant's initial allegation of incompetence, we note that the juror in question—the wife of a Chicago police officer—assured the court she could be impartial with regard to police testimony and would not discuss the case with her husband. She also stated that her husband had talked with her about homicide cases in which he had participated, but there is no allegation that he was involved in the present case. Defense counsel challenged the juror for cause, in effect arguing that her assurances of impartiality could not be believed; but, when the trial court ruled that cause had not been shown, counsel did not exercise one of his five remaining peremptory challenges to remove her from the jury.

This court has held that jury selection and the exercise of peremptory challenges are matters of judgment and discretion and therefore outside the scope of review of counsel's competency (*People v. Julian* (1980), 89 Ill. App. 3d 60, 411 N.E.2d 337), particularly where counsel has otherwise actively participated in the selection process and all jurors seated stated that they could be impartial (*People v. Smith* (1972), 7 Ill. App. 3d 07, 288 N.E.2d 19). Here, trial counsel participated vigorously in jury selection, exercising eight peremptory challenges, and the juror in question repeatedly assured the court that she could be impartial. Since there were still several jurors to be chosen, it was apparently defense counsel's considered judge-

ment that the juror not be challenged. Moreover, in the light of the trial court's determination that the juror was not biased, and her own assurances thereof, we do not find the substantial prejudice which defendant must show in order to prevail. It is not enough to demonstrate that defense counsel believed she was prejudiced; there must be sufficient proof of actual bias such as would probably have affected the outcome of the trial.

■■■ Defendant also complains of his trial attorney's failure to call four witnesses who testified at his first trial—defendant's father and stepfather, a social worker, and a psychologist who tested defendant three years prior to Pillar's killing. Decisions on what witnesses to call for the defense, like jury selection, have been recognized as questions of trial strategy (*People v. Glover-El* (1981), 102 Ill. App. 3d 535, 430 N.E.2d 147; *People v. Carter* (1980), 85 Ill. App. 3d 818, 407 N.E.2d 584) and are therefore not within the scope of this review, particularly where the testimony of the omitted witnesses would be merely cumulative (*People v. Haywood* (1980), 82 Ill. 2d 540, 413 N.E.2d 410), since there can be no substantial prejudice in the failure to present repetitive testimony. Having reviewed the testimony in question, we find that it adds nothing to what was said by other witnesses who were called to testify in the instant trial.

A similar argument is presented with respect to defense counsel's failure to make a timely request for further neurological testing. Defendant asserts that, despite an admittedly normal EEG which experts interpreted as indicating the absence of organic brain damage, testimony at his first trial established that further tests might have revealed damage undetected by an EEG. Approximately two months later, the day his second trial was to commence, defense counsel presented a motion for psychological, psychiatric, and neurological examinations at county expense, which was denied as untimely made, as well as for failure to show that defendant was indigent.

■■■ Defendant likens this situation to the failure to interview and present witnesses who would have exonerated him. However, the failure to obtain testimony—even expert testimony—is not incompetence *per se* (*People v. Ellis* (1976), 39 Ill. App. 3d 373, 350 N.E.2d 326) and, in *People v. Corder* (1982), 103 Ill. App. 3d 434, 431 N.E.2d 701, the case relied upon by defendant, there was a showing that the evidence which trial counsel failed to procure would have proved the defendant's innocence. In the instant case, we have only defendant's conjecture as to what further testing might have shown, which is similar to the situation in *People v. Ellis* (1976), 39 Ill. App. 3d 373, 350 N.E.2d 326. There, trial counsel, although relying on an insanity de-

fense, did not arrange for any psychiatric testimony nor ask that the defendant be subjected to testing. This court ruled that defendant had not established incompetence of counsel—finding that, at least in that case, it was a matter of tactics since any report obtained would also be available to the State. We noted that it was questionable whether defendant's case would be helped or hindered by expert witnesses, because the results might as easily have proved defendant's sanity. Here, too, it is questionable whether the tests would have been helpful to defendant's case; the EEG, which was originally requested by defendant, was used instead by the State as evidence of the lack of brain damage. It is likely that defendant was in a better position arguing the unproven possibility of such damage than taking the risk of positive proof of its absence. In the light of the strong testimony that defendant did not suffer from any mental defect, we cannot find that defendant, by mere conjecture, has shown any substantial prejudice in counsel's failure to make a timely motion.

In regard to defendant's last two allegations of incompetence, we find that they did not affect the outcome of the trial and therefore are not grounds for reversal. Defense counsel's failure to present evidence of a *Miranda* violation prior to trial is irrelevant, since we have concluded that no such violation occurred. We also note that the evidence in question was presented at trial, followed by a motion to suppress defendant's statements, a circumstance which further undermines defendant's claim of prejudice. (See *People v. Owens* (1976), 65 Ill. 2d 83, 357 N.E.2d 465.) Finally, as defendant concedes, counsel's failure to pursue this appeal could not have had any possible effect on the outcome of his trial.

 In addition, when the circumstances of the trial are viewed in totality, we find that defendant was competently represented. Counsel participated actively in *voir dire* thoroughly cross-examined the State's witnesses, and skillfully directed the testimony of his own witnesses. Furthermore, counsel made timely and appropriate objections, timely filed motions for direct verdict and for a new trial, and presented an organized closing argument based on the evidence.

For the foregoing reasons, defendant's conviction is affirmed.

Affirmed.

LORENZ and MEJDA, JJ., concur.