THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
RONALD REED, Defendant-Appellant.

First District (5th Division)   No. 82—1693

Opinion filed February 17, 1984.—Rehearing denied April 27, 1984.

Steven Clark and Patricia Unsinn, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard M. Daley, State's Attorney, of Chicago (Michael E. Shabat and Marie Quinlivan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE SULLIVAN delivered the opinion of the court:

After a jury trial, defendant was convicted of murder and armed violence and sentenced to a term of 28 years. On appeal, he contends that (1) his statements, as well as evidence obtained as a result thereof, should have been suppressed because they were (a) involuntarily made and (b) the fruit of an illegal arrest; and (2) the trial court erred in failing to require the jury to return a verdict on the lesser-included offense of voluntary manslaughter.

Prior to trial, defendant filed motions alleging that several inculpatory statements made by him were involuntary and therefore should be suppressed. At a hearing on the motion, Linette Willis, defendant's girlfriend, testified that he called her late in the morning on January 21, 1981, told her that he was being held on several traffic warrants, and asked that she bring $750 bond money to the police

station where he was being held. She arrived at the station with the money at approximately 5:30 that evening, but after waiting several hours she was informed that defendant was being held for murder and would not be released. She did not see defendant that night, but acknowledged that when he called her his voice sounded normal and he did not complain of being injured or that he was not receiving food.

Defendant testified that he was questioned several times between January 18 and January 20, 1981, concerning the death of Robin Williams. During questioning at his home on the 20th, officers asked if he would submit to a polygraph examination, and he agreed. Later that day, he and Robert Wheatly went to the police station at 51st and Wentworth and were transported, along with Eugene Baker, to 11th and State, where all three were given polygraph examinations. During the examination, he (defendant) did not admit guilt but did state that he owned a .32-caliber pistol. When they returned to 51st and Wentworth between 7 and 9 p.m., he was separated from Wheatly and Baker and placed in an interview room where officers asked him several questions about the gun. They asked permission to search his apartment, and he voluntarily signed a consent to search form. The officers then left to search for the gun, and he was left handcuffed to a ring in the wall. When they returned, the officers continued to question him about the gun and about Williams' death until approximately 8 a.m. on the morning of the 21st. During that time, he was continuously handcuffed, was not allowed to sleep, and was not given any food, although his requests for water or coffee or to use washroom facilities were honored.

At some point during questioning, officers told him that he was being held on outstanding traffic warrants, and he called Willis between 10 and 11 a.m. on the 21st to ask her to bring the necessary bond money. He was taken to the lockup on the morning of the 21st, but was there only one-half hour when an officer brought him back upstairs to participate as an extra in a lineup and then placed him in an interview room. He was questioned periodically throughout the day by various officers, and again was continuously handcuffed and was not given food, although he told the officers he was hungry.

Questioning continued periodically throughout the night and into the morning of January 22. During that time, he was left alone—handcuffed to a ring in the wall—for several hours while officers went to check information he provided. However, when he tried to stretch out on chairs and sleep, an officer came in and removed all but one chair. Officer Johnson spoke to him twice while he was in custody,

talked about his (Johnson's) brother-in-law, with whom he (defendant) was acquainted, discussed freebasing cocaine, and stated that he (Johnson) knew that the case was drug related and that if he (defendant) would confess, he would be charged with manslaughter, not murder. Four to 10 hours after the last conversation with Johnson, and based on the latter's promises, he decided to give a statement. He pounded on the door of the interview room and asked to speak to Wheatly. After seeing Wheatly, he made a statement to Officers Doty and Lotito, then two hours later gave a statement to Assistant State's Attorney Franks. Franks did read him his rights, but he did not recall anyone else doing so while he was in custody. During the entire time that he was at the station, he repeatedly told officers that he wanted to leave, that he wanted questioning to cease, and that he wanted to speak to his attorney. He was not allowed to sleep or given any food and was continuously handcuffed. Defendant admitted that he did not request food, but asserted that he did make known to officers that he was hungry. When he requested water or coffee, it was provided.

Detective Lotito testified that defendant, Wheatly and Baker consented to take polygraph examinations and thereafter Baker was allowed to leave, but defendant and Wheatly were not released. During the examination, defendant admitted owning a .32-caliber gun and signed a consent to search. When officers could not find the gun where defendant stated it would be, they returned to the station, placed defendant under arrest, and advised him of his constitutional rights. Defendant was advised at that time that he was also being held on a narcotics bond forfeiture warrant, a paternity warrant, and several traffic warrants. Between midnight and 1 a.m. he (Lotito) went off duty and asked members of the night shift to take defendant to the lockup; he did not know whether they did so. When he returned to the station on the 21st, defendant was brought from the lockup at approximately 5:30 p.m. and placed in an interview room.

Defendant was not questioned continuously and was able to stretch out on four chairs and rest while officers investigated what he told them. At approximately 11 p.m. on the 21st, his partner took two sandwiches to defendant; they had no further contact with him until 6 or 6:30 the following morning, and to the best of his knowledge, no other officers questioned him. At 9 a.m. on the 22d, defendant pounded on the door of the interview room and indicated that he would give a statement if allowed to speak first with Wheatly. When, he, Wheatly, and two other officers entered the room, defendant began crying and made some statements. Wheatly was removed;

defendant was again informed of his rights and made an oral statement. A second oral statement was made to Assistant State's Attorney Franks at approximately noon, followed by a written statement at 1:45 p.m. Lotito acknowledged that defendant might have asked to leave; that he was handcuffed to a ring in the wall when alone in the interview room; and that defendant did not leave the interview room from 4:30 p.m. on the 21st until 3 or 4 p.m. on the 22d. He denied that defendant ever indicated that he did not want to answer questions.

Detective Doty testified that when he arrived at the station at 8:30 a.m. on the 21st, he took defendant from an interview room to the lockup and had no further contact with him that day.

Detective Fitzgibbons testified that either he or Lotito signed defendant out of the lockup on the afternoon of January 21. Sometime during that evening, he gave defendant one bologna sandwich and a soft drink. Defendant was cuffed to the wall, but chairs were positioned so that he could sit or lie down and sleep; defendant did the latter. Fitzgibbons acknowledged that the chairs in the interview room are metal, and the ring to which defendant was handcuffed is approximately 18 inches about the seat of the chair.

Detective Johnson testified that he questioned defendant at his apartment on January 18. Thereafter, he worked the day shift and did not speak to defendant again until 9:30 a.m. on the 22d when he made an oral statement. Johnson acknowledged that he had a brother-in-law who was acquainted with defendant, but denied informing defendant of that fact.

Defendant testified in rebuttal that he tried three times to sleep on the chairs in the interview room but each time an officer, whom he could not identify and who had not testified, came in and moved the chairs.

The trial court found that defendant was handcuffed to a wall for many hours and not permitted normal sleeping conditions; that this procedure was employed by officers to induce or harass defendant into confessing; that defendant was not afforded regular and decent food while in custody; that defendant was not permitted to visit with his family and friends as he requested; and that his numerous requests to cease talking to officers were not honored. For these reasons, the trial court found that the oral statement made to the officers was involuntary and ordered that it be suppressed. However, it found that the oral and written statements made to Assistant State's Attorney Franks were severable from the police conduct and voluntarily made. In so ruling, the trial court noted that there was a sub-

stantial break in time sufficient for defendant, a person of normal intelligence, to gather his thoughts, and that Franks gave defendant the first clear admonitions regarding his rights. Defendant then presented a motion to quash his arrest and suppress statements. After hearing the arguments of counsel, but without further evidentiary hearing, the trial court denied the motion.

At trial, Robert Wheatly testified that he had been dating Williams and they had a two-year-old child. He became concerned when he had not seen her for five or six days and went to her apartment on January 18, 1981, but received no response although he could hear loud music playing and the shower running. When he returned two hours later, he noted that the shower was still running and went to the rear door of the apartment, broke a window, and entered. The apartment was filled with steam, and he noticed a foul odor. When he entered the bathroom, he discovered Williams' partially-clothed body in the bathtub. He turned the shower off, called the police, and spoke to them when they arrived. Wheatly further stated that he shared an apartment with defendant and their girlfriends, and that defendant and Williams were very close friends; he knew of no reason why defendant would want to kill her. From 8 or 9 p.m. on January 14 until the early morning hours of the 15th, he, defendant, and a third man smoked cocaine, consuming among them approximately one-quarter ounce of the substance; defendant also had a Quaalude, but he (Wheatly) did not see him take it. Defendant left the apartment between 7 and 8 a.m. on the 15th, and did not return until 2 or 3 p.m. At that time, he was quieter than usual, went straight to his room, and did not come out even when informed that a friend was there and wanted to talk to him. Wheatly also testified that smoking cocaine always seemed to make defendant tense.

Detective Salvatore testified that when initially questioned, defendant admitted owning a .32-caliber gun and stated that it was in a dresser drawer at his apartment. However, after searching the apartment with defendant's permission, the officers were unable to locate the gun.

Detective Fitzgibbons testified that after giving a written statement, defendant told officers where the gun was hidden and consented to a search of the basement of his apartment building. Defendant accompanied officers to that location and pointed out the gun, a set of keys, and a drain where he had discarded some bullets. It was stipulated that the bullets recovered from Williams' body were fired from the gun found in the basement.

Dr. Kirshner testified that the cause of death was multiple gun-

shot wounds. Williams suffered four wounds to the chest, and, in his opinion, was alive and probably conscious after the first shot was fired, judging from the amount of blood in the chest cavity, the position of the wounds, and a defense wound found on her left wrist.

Assistant State's Attorney Franks testified that he first saw defendant between 12:30 and 1 p.m. on January 22, 1981, in an interview room at the police station. After being read his *Miranda* rights and acknowledging understanding of them, defendant made an oral statement. A written statement was taken at approximately 1:45 p.m. and, after reading and initialing each page thereof, defendant made some corrections and signed the last page. In his statement, defendant explained that he had been smoking cocaine for several hours on the night of January 14-15, and took one Quaalude. He left his apartment at approximately 9:30 a.m. on the 15th, taking a loaded .32-caliber revolver with him. He started out to visit various relatives and friends, but twice fell asleep and missed his stop. He arrived at Williams' apartment between 12 and 1 p.m. and asked if he could come in and take a nap. Williams admitted him, and he went to a back room, laid down on a couch, and fell asleep. At approximately 2 p.m. he awakened to the sound of the television and the shower, and panicked when he heard noise in the house. He grabbed his gun, went to the bathroom, pushed open the door, and fired; only then did he realize that the person in the bathroom was Williams. She fell backwards into the tub, dead. In his panic, he decided to make it appear that "a wild man" had done it, and shot her three more times. He took her keys, locked the door, and returned to his apartment where he hid the gun and keys in the basement and threw the four spent shells into a sewer. Franks further testified that, in his oral statement, defendant said that he saw Williams when he pushed the door open and that he took the Quaalude at approximately 5 a.m. At one time during the oral statement, defendant was upset and close to tears and explained that he had been feeling guilty and distraught for days.

Dr. Melvin Seglin, a psychiatrist, testified for defendant that the combination of smoking cocaine for 12 hours and ingesting one Quaalude would usually cause a person to become euphoric, grandiose, hyperactive, hypervigilant, and fatigued, although there could be dissimilarites in reaction attributable to individual physical condition and the amount of experience with drugs; the reaction would be less intense in one experienced in their use. Seglin defined hypervigilance as a heightened state of awareness of danger, a readiness to respond to potential danger at a moment's notice. In his opinion, one who had ingested the drugs and fell into a deep sleep would not be in a state

to make a rational judgment if suddenly awakened; furthermore, it might take a second longer to recognize someone. Seglin acknowledged that most of his information on the effect of these drugs came from literature rather than personal observation, and that the effects of the drugs would dissipate over a six- to seven-hour period after the last ingestion of cocaine. At that time, perceptions and reactions would be more normal.

OPINION

Defendant first contends that, given the lack of evidence that the coercive conditions found to have induced his first statement had dissipated, the trial court's finding that subsequent statements made by him were voluntary is against the manifest weight of the evidence.

The State bears the burden of demonstrating that a defendant's statements were voluntarily made. (*People v. Kincaid* (1981), 87 Ill. 2d 107, 429 N.E.2d 508, *cert. denied* (1982), 455 U.S. 1024, 72 L. Ed. 2d 144, 102 S. Ct. 1726.) This question is one of fact to be determined by the trial court (*People v. Dalton* (1982), 91 Ill. 2d 22, 434 N.E.2d 1127) after consideration of the totality of the circumstances (*People v. Hebein* (1982), 111 Ill. App. 3d 830, 444 N.E.2d 782), and it need be convinced only by a preponderance of the evidence that the statement in question was voluntary; that is, that the accused's will was not overborne such that the statement "cannot be deemed the product of a rational intellect and a free will" (*People v. Kincaid* (1981), 87 Ill. 2d 107, 117, 429 N.E.2d 508, 511). Therefore, where the question has been ruled upon by the trial court and the proper legal standard has been employed, the sole question for review is whether its determination is contrary to the manifest weight of the evidence. (*People v. Brownell* (1980), 79 Ill. 2d 508, 404 N.E.2d 181, *cert. dismissed* (1980), 449 U.S. 811, 66 L. Ed. 2d 14, 101 S. Ct. 59; *People v. Medina* (1978), 71 Ill. 2d 254, 375 N.E.2d 78.) Moreover, where one statement is found to be involuntary, it does not necessarily follow that any subsequent statements are also inadmissible (see *People v. Burris* (1971), 49 Ill. 2d 98, 273 N.E.2d 605); however, where it is found that an original statement was unlawfully obtained, subsequent statements made while under the same constraints are also inadmissible (*People v. Taylor* (1965), 33 Ill. 2d 417, 211 N.E.2d 673), and a presumption exists that all were the product of the same improper conduct (*People v. Landgham* (1970), 122 Ill. App. 2d 9, 257 N.E.2d 484, *cert. denied* (1971), 402 U.S. 911, 28 L. Ed. 2d 652, 91 S. Ct. 1389). Thus, the trial court must determine whether the State has met its burden of proving that the "previous coercive influences have

been sufficiently dissipated to insure that the confession offered in evidence is the product of the free will of the defendant" (*People v. Raddatz* (1968), 91 Ill. App. 2d 425, 435-36, 235 N.E.2d 353, 358-59), and subsequent statements should be suppressed where "there was 'no break in the stream of events' *** 'sufficient to insulate' the final events 'from the effects of all that went before'" (*Darwin v. Connecticut* (1968), 391 U.S. 346, 349, 20 L. Ed. 2d 630, 633-34, 88 S. Ct. 1488, 1490).

In the instant case, defendant's initial statement was made after he had been detained and periodically questioned in the police station for about 36 hours, and the trial court found that it was induced by police misconduct in handcuffing defendant to the wall for many hours, in not permitting normal sleeping conditions, in denying him adequate food while in custody, and in failing to honor his numerous requests that questioning cease. It then ruled that the subsequent statements, made three and four hours later, were voluntarily made, finding that "there [was] a sufficient break in time and circumstances to allow the different statements to be severed one from another." However, the only altered circumstances noted by the trial court was the giving of clear *Miranda* warnings by the assistant State's Attorney prior to taking the later statements. We note, however, that although defendant said he did not recall any prior warnings, it was the testimony of Detective Lotito that they were given to defendant on two occasions before his first statement.

The State contends "that whatever coercive influences the trial court found surrounding the defendant's first confession simply did not exist when defendant gave the court-reported confession to Assistant State's Attorney Franks." Three reasons are argued by the State in support thereof: (1) that "defendant evidently was no longer handcuffed to the ring on the wall, as he had been at times before he gave the first confession"; however, there is no evidence in the record that he was not handcuffed between the confessions, other than the fact that he was not when he gave the second confession; (2) that "defendant was given two sandwiches and something to quench his thirst on the morning of the 22nd"; the record reveals, however, that while Office Lotito said his partner brought two sandwiches to defendant on the evening of the 21st, another officer said that only one bologna sandwich was given to defendant; that no one testified that defendant had eaten anything, and defendant denied that he was given any food; and (3) that during the four-hour period between the confessions "defendant was able to obtain sufficient rest ***." There is no testimony, however, that he did, or even could have, slept during

this time. To the contrary, according to the officers, he was alone during most of that time and he was handcuffed to the wall whenever he was left alone. In substance, defendant testified that he was periodically questioned during the four-hour period and could not sleep because the officers had removed all chairs from the room except one, and he was handcuffed to the wall.

Defendant also gave uncontradicted testimony that during the entire time he was at the station, which would include the period between confessions, he told the officers that he wanted to leave, that he wanted the questioning to cease, and that he wanted to speak to his lawyer. It thus appears that there was little, if any, change in the coercive circumstances found by the trial court to have induced the first statement, and it is thus our view that the State has not met its burden of overcoming the presumption that the subsequent statements were the product of the same constraints. For this reason, we believe that the trial court's finding to the contrary is against the manifest weight of the evidence, and the oral and written statements made to the assistant State's Attorney should have been suppressed.

Defendant further contends that the gun, keys, and bullets found as a result of those illegally obtained statements must be suppressed. He maintains that when a confession has been illegally obtained and there is established some connection between the confession and the physical evidence sought to be suppressed, the State must show "by clear and convincing evidence that the challenged evidence has come from an independent source." (*People v. Wilson* (1975), 60 Ill. 2d 235, 238, 326 N.E.2d 378, 380.) In the instant case, while defendant asserts that the evidence was recovered as a direct result of his confession, it appears that he signed admittedly voluntary consents to search his apartment and the basement of the building. The first was given before his initial confession, and the other was after his confession to the assistant State's Attorney. Following the second consent, defendant accompanied the officers and assisted them by pointing out where the items were hidden. Nevertheless, defendant argues that the items should have been suppressed because the consent to search was tainted by the improper police conduct in coercing the confession, and the police became aware of the existence and location of the evidence as a result of this confession. We note, however, that defendant does not contend that he acted involuntarily in leading the officers to the items in question, and that he did so after being informed of his rights and acknowledging his understanding of them. We believe that defendant's voluntary actions in this regard do constitute an independent source for the evidence since, under the

circumstances, the officers had no need to, and apparently did not, rely on the information obtained through defendant's confession; in effect, defendant turned the evidence over to the police, obviating any need to search for it.

■■ Defendant also contends that these items should have been suppressed because they were the fruit of his illegal arrest. He acknowledges that his arrest was justified by the existence of outstanding warrants, but maintains that, under section 110—7(b) of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1979, ch. 38, par. 110—7(b)), the police were required to release him from custody when Willis appeared with bond money. Therefore, he posits, his detention beyond 6 p.m. on January 21 constituted an illegal arrest because the police had no reasonable grounds to believe that he was involved in Williams' murder.

While defendant presents an interesting argument, we note that section 110—16 of the Code of Criminal Procedure of 1963 provides that "[i]f a person admitted to bail on a felony charge forfeits his bond and fails to appear in court during the 30 days immediately after such forfeiture, on being taken into custody thereafter *he shall not be bailable* in the case in question, unless the court finds that his absence was not for the purpose of obstructing justice or avoiding prosecution." (Emphasis added.) (Ill. Rev. Stat. 1979, ch. 38, par. 110—16.) In the instant case, among the seven outstanding warrants on which defendant's arrest was predicated was a bond forfeiture warrant on a charge of possession of a controlled substance, in violation of section 402 of the Illinois Controlled Substances Act (Ill. Rev. Stat. 1979, ch. 56½, par. 1402), which is a felony. Moreover, it does not appear that the finding required by section 110—16 was made or requested. Thus, contrary to defendant's assertion, the police were not required to release him on bail and, since the arrest was made pursuant to a valid warrant, the State was not required to establish probable cause for his arrest.

For the foregoing reasons, defendant's conviction, which was based at least in part on the illegally obtained confession, is reversed. In view of this holding, we need not address the remaining issue. However, we believe that there was sufficient evidence from which a trier of fact could find defendant guilty beyond a reasonable doubt, and therefore the case will be remanded for a new trial.

Reversed and remanded.

LORENZ and MEJDA, JJ., concur.